UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| A WOMAN'S FRIEND PREGNANCY RESOURCE CLINIC, CRISIS PREGNANCY CENTER OF NORTHERN CALIFORNIA, ALTERNATIVES WOMEN'S CENTER, | No.  2:15-cv-02122-KJM-AC |
| Plaintiffs, | ORDER |
| v. | |
| KAMALA HARRIS, Attorney General of the State of California, In Her Official Capacity, | |
| Defendant. | |

       Crisis pregnancy centers devoted to providing alternatives to abortion and discouraging abortion, also known as CPCs, have been operating in this country for several decades at least.  Recently, the practices of some CPCs have prompted several state and municipal legislative bodies to adopt regulations governing the information provided to women seeking reproductive care.  The changing landscape effected by implementation of the federal Affordable Care Act also has provided a backdrop to state and local legislative action.  In the last year, the California Legislature adopted a provision known as the FACT Act, AB 775, which governs all clinics providing family planning or pregnancy-related services, including CPCs.  In

1

1    passing AB 775, the Legislature articulated its intent to supplement its own prior efforts to advise

2    women of the state's reproductive health programs.  As applicable here, the new law, scheduled to

3    take effect January 1, 2016, requires licensed facilities that meet certain criteria to provide a

4    notice to clients regarding the availability of free or low-cost public family planning services.

5    Three CPCs operating in this judicial district challenge AB 775 as unconstitutional, in violation of

6    their First Amendment Free Speech and Free Exercise rights.  In the pending motion for

7    preliminary injunction they seek to block the new law's taking effect pending full litigation of this

8    action.  Having carefully considered the parties' briefs, the parties' arguments at a specially set

9    hearing, and the applicable law, the court DENIES plaintiffs' motion for the reasons set forth

10   below.

11   I.      PROCEDURAL HISTORY

12           Plaintiffs filed this action in this court on October 10, 2015.  Compl., ECF No. 1.

13   Before the State answered, plaintiffs amended the complaint.  First Am. Compl. (FAC), ECF

14   No. 4.  The amended complaint alleges the California Reproductive Freedom, Accountability,

15   Comprehensive Care, and Transparency Act (the Act) is unconstitutional both on its face and as

16   applied.  FAC ¶ 4.  It includes two claims: (1) the Act is unconstitutional because it violates

17   plaintiffs' rights to freedom of speech under the First Amendment to the United States

18   Constitution, *id*. ¶¶ 44–47; and (2) the Act is unconstitutional because it violates plaintiffs' rights

19   to free exercise of religion under the same Amendment, *id*. ¶¶ 48–51.  Plaintiffs request

20   declaratory judgment that the Act is unconstitutional on its face and as applied, preliminary and

21   permanent injunctive relief prohibiting enforcement of the Act, attorneys' fees and costs, and all

22   other appropriate relief.

23           The State answered on November 9, 2015.  ECF No. 7.  It denies the Act is

24   unconstitutional, Answer ¶¶ 44–51, and it advances one affirmative defense:  It asserts the action

25   is barred because the claims are not ripe for review, *id*. at 9.

26           Plaintiffs filed this motion for a preliminary injunction on November 13, 2015,

27   Mot. Prelim. Injunction, ECF No. 8; Mem. P. & A., ECF No. 9.  At hearing, plaintiffs clarified

28   their motion is based on an as-applied challenge only.  The State opposed the motion on

1   December 4, 2015, ECF No. 16, and plaintiffs replied on December 11, 2015, ECF No. 17.  The

2   court held a hearing on December 18, 2015.  Kevin Snider and Matthew McReynolds appeared

3   for plaintiffs, and Noreen Skelly and Marc LaForestier appeared on behalf of the State.

4   II.      THE ACT

5            A.      Text of Statute

6                    California Assembly Bill (AB) 775 enacts new sections of the California Health

7   and Safety Code, comprising "the Reproductive FACT (Freedom, Accountability,

8   Comprehensive Care, and Transparency) Act or Reproductive FACT Act."  Cal. Health & Safety

9   Code § 123470.  The Act provides in pertinent part, that a

10                  "licensed covered facility" means a facility licensed under Section
                    1204 or an intermittent clinic operating under a primary care clinic
11                  pursuant to subdivision (h) of Section 1206, whose primary purpose
                    is providing family planning or pregnancy-related services, and that
12                  satisfies two or more of the following:

13                  (1) The facility offers obstetric ultrasounds, obstetric sonograms, or
                    prenatal care to pregnant women.
14
                    (2) The facility provides, or offers counseling about, contraception
15                  or contraceptive methods.

16                  (3) The facility offers pregnancy testing or pregnancy diagnosis.

17                  (4) The facility advertises or solicits patrons with offers to provide
                    prenatal sonography, pregnancy tests, or pregnancy options
18                  counseling.

19                  (5) The facility offers abortion services.

20                  (6) The facility has staff or volunteers who collect health
                    information from clients.
21

22   *Id.* §123471.  A facility covered by the Act is required to disseminate a notice to clients:

23                  (a) A licensed covered facility shall disseminate to clients on site
                    the following notice in English and in the primary threshold
24                  languages for Medi-Cal beneficiaries as determined by the State
                    Department of Health Care Services for the county in which the
25                  facility is located.

26                  (1) The notice shall state:

27                  "California has public programs that provide immediate free or
                    low-cost access to comprehensive family planning services
28                  (including all FDA-approved methods of contraception), prenatal

                                                        3

care, and abortion for eligible women.  To determine whether you qualify, contact the county social services office at [insert the telephone number]."

(2) The information shall be disclosed in one of the following ways:

(A)  A public notice posted in a conspicuous place where individuals wait that may be easily read by those seeking services from the facility.  The notice shall be at least 8.5 inches by 11 inches and written in no less than 22-point type.

(B)  A printed notice distributed to all clients in no less than 14-point type.[1]

(C)  A digital notice distributed to all clients that can be read at the time of check-in or arrival, in the same point type as other digital disclosures.  A printed notice as described in subparagraph (B) shall be available for all clients who cannot or do not wish to receive the information in a digital format.

(3) The notice may be combined with other mandated disclosures.

*Id.* § 123472.

The law imposes civil penalties for failure to comply with the notice requirements:

(a)  Covered facilities that fail to comply with the requirements of this article are liable for a civil penalty of five hundred dollars ($500) for a first offense and one thousand dollars ($1,000) for each subsequent offense.  The Attorney General, city attorney, or county counsel may bring an action to impose a civil penalty pursuant to this section after doing both of the following:

(1)  Providing the covered facility with reasonable notice of noncompliance, which informs the facility that it is subject to a civil penalty if it does not correct the violation within 30 days from the date the notice is sent to the facility.

(2)  Verifying that the violation was not corrected within the 30-day period described in paragraph (1).

(b)  The civil penalty shall be deposited into the General Fund if the action is brought by the Attorney General. If the action is brought by a city attorney, the civil penalty shall be paid to the treasurer of the city in which the judgment is entered.  If the action is brought

---

[1] During the hearing, both parties agreed the second option provided by the Act, if exercised by a clinic, mandates a printed notice be distributed to all clients at the time of check-in or arrival.  The court having consulted that language of the Act after hearing continues to read the applicable text as allowing the printed notice to be distributed on site to clients at any time before, during, or after the time of check-in or arrival.

1    by a county counsel, the civil penalty shall be paid to the treasurer
     of the county in which the judgment is entered.

2

3    *Id*. § 123473.

4          The Act exempts two types of facilities from the new regulation:

5          (1) A clinic directly conducted, maintained, or operated by the
           United States or any of its departments, officers, or agencies.

6

7          (2) A licensed primary care clinic that is enrolled as a Medi-Cal
           provider and a provider in the Family Planning, Access, Care, and
           Treatment Program.

8

9    *Id*. § 123471.

10          B.   Legislative History and Purpose[2]

11          Federal health care policy provides a backdrop to the state law at issue here.  In

12   2010, Congress passed the federal Patient Protection and Affordable Care Act (ACA), a law

13   which made millions of Californians, 53 percent of them women, newly eligible for Medi-Cal.

14   *Hearing on AB 775 Before the Assembly Comm. on Health*, 2015–2016 Sess. 2 (Cal. 2015), ECF

15   No. 11-2 (Pls.' Ex. 2).  The ACA allowed California to establish or expand several programs that

16   provide reproductive health care and counseling to low-income women.  AB 775 § 1.

17          In California, more than 700,000 women become pregnant every year.  AB 775

18   § 1.  Of those pregnancies, approximately one-half are unintended.  *Id*.  In 2010, 64.3 percent of

19   unplanned births in California were publicly funded.  *Id*.  By 2012, more than 2.6 million

20   California women were in need of publicly funded family planning services.  *Id*.  At the moment

21   they learn they are pregnant, thousands of women remain unaware of the California programs

22   _____

23          [2] This background is drawn from the filings by both parties, which include documents
     from the Official California Legislative Information Website, and thus constitute public
24   documents and statements.  The court takes judicial notice of these public statements, available
     generally at http://leginfo.ca.gov.  *See also* Fed. R. Evid. 201 (governing judicial notice); *Ellis v.*
25   *J.P. Morgan Chase & Co.*, 950 F. Supp. 2d 1062, 1080 n.17 (N.D. Cal. 2013) (publicly available
     documents published on a government website may be subject to judicial notice); *In re Charles*
26   *Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 561 n.18 (N.D. Cal. 2009) (same; court may take
     judicial notice of such a document *sua sponte*).
27

28

1   available that provide them with contraception, health education and counseling, family planning,

2   prenatal care, abortion, or delivery.  *Id.*

3           In order to ensure California residents can make their personal reproductive health

4   care decisions in an informed manner, the California Legislature passed the Act.  As noted above,

5   the Act requires licensed clinics that give family planning or pregnancy-related services to

6   provide a notice to consumers regarding their reproductive rights and the availability of such

7   services in California.[3]  *Id.*  But the state Legislature identified a need to supplement its own

8   efforts to advise women of the state's reproductive health programs, particularly because

9   pregnancy decisions are time sensitive.  AB 775 § 1.  The Act was seen as the "most effective

10  way" to ensure women quickly obtain the information and services needed to make and

11  implement timely reproductive decisions.  *Id.*

12          Assemblyman David Chiu first introduced the Act on February 25, 2015, with the

13  goal of providing "technical, non-substantive changes" to a law that prohibited a person from

14  "selling, offering for sale, giving away, distributing, or otherwise furnishing materials intended to

15  determine the presence of pregnancy, unless that person has obtained a certificate of acceptability

16  from the State Department of Public Health declaring that the materials have been approved as to

17  efficacy and safety by the department."  *Assemb. Chiu Intro.  AB 775, 2015–2016 session*,

18  99 (Cal. 2015).

19          On March 26, 2015, Chiu's bill was amended to include text more similar to the

20  statutory language ultimately adopted.  *See Assemb. Chiu First Amend. AB 775, 2015–2016

21  session*, 98 (Cal. 2015) ("Assemb. First Amend.").  Specifically, the amendment included

22  provisions requiring a licensed covered facility to disseminate a notice to all clients stating that

23

24

_____

25          [3]  The Act also requires unlicensed facilities that provide pregnancy-related services to
    disseminate and post a notice informing consumers that they are not licensed medical facilities

26  and to include the notice in their advertising materials.  Pls.' Ex. 2 at 2.  Plaintiffs do not
    challenge portions of the bill that address unlicensed facilities.  Thus, this order only applies to

27  portions of the bill that address licensed facilities, including the CPCs at issue in this case.

28

1   "every pregnant woman has a right to decide whether to have a child or to obtain abortion care."

2   *Id.*

3        On April 8, 2015, the bill was again amended, removing the language added in the

4   March 26 amendment. *See Assemb. Chiu Second Amend. AB 775, 2015–2016 session*, 97 (Cal.

5   2015) ("Assemb. Second Amend.").  In its place, a provision was added to state the following:

6          California has public programs that provide immediate free or low-
       cost access to comprehensive family planning services, prenatal

7          care, and abortion, for eligible women.

8   *Id.*

9        By incorporating this language, the Legislature sought to address a concern

10  regarding crisis pregnancy centers ("CPCs"), facilities used by many pregnant women throughout

11  California. *Id.*  CPCs, which may be licensed or unlicensed, provide a wide array of resources

12  related to reproductive health. *Id.* at 7.  Many CPCs, however, do not offer services other than

13  what they describe as "pro-life" pregnancy options, so they do not make abortion referrals or

14  procedures. *Hearing on A.B. 775 Before the Senate Comm. on Health*, 2015–2016 Sess. 6 (Cal.

15  2015), ECF No. 11-6 (Pls.' Ex. 6).  This is because CPCs are commonly affiliated with

16  organizations that do not believe women should have abortions.  Pls.' Ex. 2 at 7.  Many CPCs are

17  Christian belief-based organizations.  Pls.' Ex. 6 at 6.

18       As perceived by the Legislature, these beliefs lead CPCs to interfere with a

19  woman's ability to be fully informed and exercise her reproductive rights, primarily by posing as

20  full-service women's health clinics but discouraging women from seeking abortions. *Id.*  To

21  prevent women from accessing abortion resources, some CPCs use "intentionally deceptive

22  advertising and counseling practices [which] often confuse, misinform, and . . . intimidate women

23  from making fully-informed, time-sensitive decisions about critical healthcare." *Id.*

24       Assemblyman Chiu and Assemblywoman Autumn Burke, the co-authors of AB

25  775, based their findings in part on a 2015 report by the National Abortion Rights Action League

26  (NARAL), a vocal pro-choice organization.  Pls.' Ex. 2 at 2.  For the report, NARAL sent several

27  researchers into CPCs to receive the counseling offered. *Id.*  Many of the researchers reported

28  being provided with inaccurate information regarding the risks of abortion, including being told

1    that many women commit suicide after having an abortion and that abortions can cause breast

2    cancer.  *Id.*

3             On April 25, 2015, the Assembly Judiciary Committee held a hearing on the bill.

4    *Hearing on A.B. 775 Before the Assembly Comm. on Judiciary*, 2015–2016 Sess. 1 (Cal. 2015),

5    ECF No. 11-3 (Pls.' Ex. 3).  The committee considered whether the Act as proposed would

6    regulate all pregnancy centers or just CPCs.  *Id.*  Legislators took account of a 2010 report issuing

7    from the University of California, Hastings College of Law regarding CPC practices and potential

8    legislative options for regulating them.  Pls.' Ex. 2 at 5-6.  The options identified in the report

9    ranged from creating new regulations to leveraging existing regulations aimed specifically at

10    medical services.  *Id.*  Cognizant of the potential for First Amendment challenges, legislators

11    decided to regulate all pregnancy centers, including but not limited to CPCs.  *Id.*

12             After two additional amendments, eliminating a reference to a right to privacy in

13    the findings and substituting the language appearing in the law enacted,[4] the Assembly passed AB

14    775 on May 26, 2015 by a vote of 49 to 26.  *Assemb. Unoff. Ballot AB 775, 2015-2016 Sess.* (Cal.

15    2015).  The Senate adopted the bill later in the year on September 3, 2015 by a vote of 24 to 14.

16    *Sen. Unoff. Ballot. AB 775, 2015-2016 Sess.* (Cal 2015).  The bill was forwarded to the Governor

17    on September 16, 2015, who signed it into law on October 9, 2015.  *Id.*; *see* Complete Bill

18    History of AB 775.

19             Attorney General Kamala Harris was a primary co-sponsor, along with NARAL

20    and Support Black Women for Wellness.  *Hearing on A.B. 775 Before the Senate Comm. on*

21    *Rules*, 2015–2016 Sess. 6 (Cal. 2015) (Pls.' Ex. 7).  Supporters included the California Religious

22    Coalition for Reproductive Choice, the California Immigrant Policy Center, and California

23    Latinas for Reproductive Justice.  *Id.* Organizations in opposition to AB 775 included the

24    Alliance for Defending Freedom, the Alternatives Pregnancy Center, the California Catholic

25    Conference, and the California Right to Life Committee.  *Id.*

26

27

28

---

[4] *See Assemb. Chiu Third Amend. AB 775, 2015–2016 session*, 97 (Cal. 2015) ("Assemb. Third Amend."); *see also See Assemb. Chiu Fourth Amend.  AB 775, 2015–2016 session*, 97 (Cal. 2015) ("Assemb. Fourth Amend.")

III.    THE PARTIES

    A.    A Woman's Friend Pregnancy Resources Clinic (A Woman's Friend)

        A Woman's Friend is a tax-exempt, non-profit religious corporation established under section 501(c)(3) of the Internal Revenue Code and located in Marysville, California. Dodds Decl. ¶ 2, ECF No. 10-1; FAC ¶ 9.  It is licensed under California Health and Safety Code section 1204.[5]  FAC ¶ 9.  It offers all of its services free of charge.  Dodds Decl. ¶ 28.  It was organized "for the express purpose of providing alternatives to abortion for women experiencing unplanned pregnancies."  *Id.* ¶ 2.  Its bylaws provide more specifically that its purpose "is to help a pregnant woman in crisis to understand [and] work through alternatives so she can make an informed decision about the outcome of her pregnancy."  *Id.*  ¶ 3.  "In addition, A Woman's Friend seeks to provide counsel and practical help to all parties experiencing a crisis produced by an unplanned pregnancy."  *Id.*  "A Woman's Friend finds abortion an unacceptable alternative."  *Id.*

        A Woman's Friend requires its employees, volunteers, and board members to read and sign a statement of faith.  *Id.* ¶ 4.  Among other affirmations, the statement of faith confirms the person believes "the Bible to be the inspired, the only infallible authoritative Word of God"; "that there is one God, eternally existent in three persons: Father, Son, and the Holy Spirit"; and that "salvation is received through faith in Jesus Christ as Savior and Lord and not as a result of good works."  *Id.*  A Woman's Friend also incorporates prayer throughout its operations,

---

    [5] "Only the following defined classes of primary care clinics shall be eligible for licensure [under section 1204]: . . . A 'free clinic' means a clinic operated by a tax-exempt, nonprofit corporation supported in whole or in part by voluntary donations, bequests, gifts, grants, government funds or contributions, that may be in the form of money, goods, or services.  In a free clinic there shall be no charges directly to the patient for services rendered or for drugs, medicines, appliances, or apparatuses furnished.  No corporation other than a nonprofit corporation exempt from federal income taxation under paragraph (3) of subsection (c) of Section 501 of the Internal Revenue Code of 1954 as amended, or a statutory successor thereof, shall operate a free clinic; provided, that the licensee of any free clinic so licensed on the effective date of this section shall not be required to obtain tax-exempt status under either federal or state law in order to be eligible for, or as a condition of, renewal of its license.  No natural person or persons shall operate a free clinic." Cal. Health & Safety Code § 1204(a)(1)(B).

1   including at the beginning of every employee's or volunteer's shift and in every board meeting.

2   *Id.* ¶ 5.  A Woman's Friend's "motivation for the ministry is spiritual," and "[n]o commercial

3   transactions take place at the clinic."[6]  *Id.* ¶ 28.

4           A Woman's Friend refers to those who seek its services as "clients."  *See, e.g.*, *id.*

5   ¶ 6.  Clients may call or walk in to the clinic.  *Id.*  Clients are greeted by a receptionist, who

6   usually schedules an appointment for the same day or the next business day.  *Id.*  The receptionist

7   helps clients fill out a form to request a service and what services clients need.  *Id.* ¶ 7.  The

8   receptionist also copies the clients' picture ID.  *Id.*  A registered nurse, whom A Woman's Friend

9   refers to as a "Client Advocate," then meets with clients in a consultation room and fills out an

10  information sheet.  *Id.* ¶¶ 8, 13–19.  The nurse instructs clients on the administration of a

11  pregnancy test, and the test is administered.  *Id.* ¶ 9.

12          If the test is positive, the nurse estimates a client's due date and the date her

13  pregnancy began.  *Id.* ¶ 10.  The nurse collects statistical and medical information, including the

14  client's vital signs, blood type, contraceptive use, history of pregnancies, surgeries,

15  hospitalizations, sexually transmitted infections, other illnesses, substance abuse, current

16  medications, and other information.[7]  *Id.* ¶ 15.  The nurse alerts the client to symptoms that

17  indicate immediate or more comprehensive medical care is necessary, including the symptoms of

18  ectopic pregnancy and miscarriage.  *Id.* ¶ 10.  The nurse also offers brochures, pamphlets,

19  referrals, and a medical appointment.  *Id.*  The nurse explains the services A Woman's Friend

20  offers, which include pre-parenting classes and a selection of used and new children's clothing,

---

21          [6]  The State points out the qualifier "at the clinic."  *See* Opp'n 10, ECF No. 16 ("[Ms.
22  Dodd's declaration] is . . . ambiguous about whether transactions, be they commercial or
    charitable, do occur. . . . The statement ["at the clinic"] suggests that transactions occur elsewhere
23  or in other circumstances.").  The record includes no evidence of transactions other than
    transactions at the clinic.  The evidence before the court suggests none take place.  *See* Dodds
24  Decl. ¶ 28 ("A Woman's Friend provides all of its services (as well as all products, such as
25  literature, vitamins, maternity and infant clothing, and baby furniture) free of charge.").

26          [7]  Ms. Dodds's declaration does not specify whether this information is collected from all
27  clients or from only those whose pregnancy tests are positive, but the context suggests this
    information is collected only if the test is positive.  *See id.* ¶¶ 15–19.

28

1   maternity clothing, baby furniture, and other childcare supplies, *id.*, all of which a Woman's

2   Friend offers free of charge, *id.* ¶ 28.  The nurse advises the client to obtain health insurance

3   benefits for prenatal care.  *Id.* ¶ 16.  The nurse teaches the client about prenatal health and well-

4   being, nutrition, and fetal development and offers to perform a limited first trimester ultrasound.

5   *Id.* ¶ 17.  Usually an ultrasound appointment is scheduled for a later date, although sometimes an

6   ultrasound may be provided the same day.  *Id.*

7        If the pregnancy test is negative, the nurse encourages the client to seek

8   confirmation from a physician and offers information about sexually transmitted infections or

9   diseases and sexual abstinence.  *Id.* ¶ 12.

10        Whether the test is positive or negative, before the client leaves, the nurse informs

11   her it is a "life-affirming faith based organization" and gives her a copy of the New Testament,

12   two DVDs, a gospel tract, and popcorn and candy.  *Id.*  The nurse asks the client for permission to

13   pray together and asks her to fill out a client-service questionnaire.  *Id.*

14        The medical staff at A Woman's Friend includes a medical doctor, a doctor of

15   obstetrics and gynecology, and several registered nurses.  *Id.* ¶ 20.  Its medical director is a

16   medical doctor licensed to practice in California.  *Id.* ¶ 27.  He reviews A Woman's Friend's

17   services annually to ensure these services comply with evidence-based medical standards and

18   provide clients with true, correct, and current information.  *Id.* ¶ 21.  A Woman's Friend is

19   "committed to providing its clients with accurate and complete information about both prenatal

20   development and abortion" and "assisting women to carry to term by providing emotional support

21   and practical assistance."  *Id.* ¶ 23.  "It is not a practice of A Woman's Friend to discuss birth

22   control with clients unless the client asks a direct question."  *Id.* ¶ 25.  "All questions regarding

23   this and other medical information are directed to licensed medical personnel for a response."  *Id.*

24   Nevertheless, A Woman's Friend does distribute literature that states abstinence is the only sure

25   way to avoid pregnancy and sexually transmitted infections.  *Id.*  A Woman's Friend does not

26   provide ongoing prenatal care or emergency services, and it advises its clients to obtain these

27   services from a physician or local hospital.  *Id.* ¶ 16.

28

11

1        Carol Dodds, the CEO of A Woman's Friend, *id.* ¶ 1, has submitted a declaration

2   to express her belief that the Act's notice provisions are "utterly contrary to our faith and what the

3   organization wishes to say," *id.* ¶ 30.  Under her understanding of the Act, if A Woman's Friend

4   does not display the notice, it will be fined $500 for the first offense and $1,000 for each

5   subsequent offense.  *Id.*  She avers that these penalties "would financially jeopardize the work of

6   the clinic." *Id.* ¶ 31.

7        B.        Crisis Pregnancy Center of Northern California (CPCNC)

8        CPCNC is a religious non-profit corporation established under section 501(c)(3) of

9   the Internal Revenue Code and located in Redding, California.  FAC ¶ 10.  It is licensed under

10  California Health and Safety Code section 1204.  *Id.*  It offers all of its services free of charge.

11  Gibbs Decl. ¶ 22, ECF No. 10-2.  It is an affiliate of Care Net, and has adopted Care Net's

12  mission statement and statement of faith.  *Id.* ¶¶ 4–5.  Care Net is a national organization whose

13  mission states that "every human life begins at conception and is worthy of protection." *Id.* ¶ 5.

14  "Care Net envisions a culture where women and men faced with pregnancy decisions are

15  transformed by the gospel of Jesus Christ and empowered to choose life for their unborn children

16  and abundant life for their families." *Id.* ¶ 6.  Care Net's statement of faith explains its belief that

17  the Bible is "the inspired, the only infallible, authoritative Word of God"; that "there is one God,

18  eternally existent in three persons; Father, Son and Holy Spirit"; and that "salvation is received

19  through faith in Jesus Christ as Savior and Lord and not as a result of good works," among other

20  tenets.  *Id.* ¶ 7.  In the same vein, CPCNC is a "religiously based organization" and exists "to help

21  women and men in need" rather than to "engage in commercial transactions." *Id.* ¶¶ 2, 22.

22       CPCNC refers to those who seek its services as "clients." *See, e.g.*, *id.* ¶ 9.

23  CPCNC's day-to-day activities "are focused on offering free services to families that are in need

24  of assistance throughout pregnancy and through their child's third year." *Id.* ¶ 10.  It offers its

25  clients pregnancy tests, first trimester ultrasounds, referrals, an educational program, counseling,

26  and mentoring.  *Id.* ¶¶ 10, 22.  CPCNC also offers classes on nutrition, labor and delivery,

27  parenting, pregnancy, community resources and referrals, and other topics.  *Id.*  It also offers

28

12

1    information about sexually transmitted infections or diseases, and offers information about sexual

2    abstinence if requested.  *Id.* ¶ 23.

3            CPCNC's staff includes four registered nurses and a registered diagnostic medical

4    sonographer.  *Id.* ¶ 15.  Its medical director is a licensed obstetrician and medical doctor.  *Id.*  The

5    medical director oversees its medical procedures, reviews, approves, and signs off on ultrasounds,

6    and accepts referrals for clients in need of prenatal and pediatric care.  *Id.*  The medical director

7    also regularly consults with CPCNC's medical sonographer.  *Id.*  CPCNC's staff includes other,

8    non-medical personnel, but they do not provide medical advice.  *Id.* ¶ 19.  CPCNC trains its staff

9    members over a period of six to twelve months before they begin work with clients.  *Id.* ¶ 13.  Its

10   staff takes care not to answer questions beyond their scope of practice and refers clients to

11   medical doctors, the emergency room, and other local medical facilities as necessary.  *Id.*

12           CPCNC is "extremely adamant" about its commitment to care and competence.

13   *Id.* ¶ 20.  When CPCNC's clients are pregnant, its services are intended to provide them with

14   information about the options available to them, including carrying a child to term, raising the

15   child, obtaining an adoption, or abortion.  *Id.*  CPCNC desires that each client "make an educated

16   choice with the proper information," based on facts and the truth and after thorough consideration

17   of all available options.  *Id.* ¶ 21.

18           Shelly Gibbs, CPCNC's CEO, *id.* ¶ 1, has submitted a declaration explaining her

19   understanding that the Act "requires that a licensed clinic like CPCNC provide a notice that girls

20   and women may receive free or low cost abortions."  *Id.* ¶ 24.  She understands that "the notice

21   requires CPCNC to communicate that our clients contact the County social services and actually

22   provide the phone number."  *Id.*  She believes the notice is "diametrically opposed to the

23   religiously based mission and goals of CPCNC," and explains that "[b]ecause the notice is to be

24   conspicuously posted in the waiting room so that it can easily be read, it is among the first

25   communications, if not the first communication, made to a client."  *Id.*

26       C.    Alternatives Women's Center (AWC)

27           AWC is a religious non-profit corporation established under section 501(c)(3) of

28   the Internal Revenue Code and located in Escondido, California.  DeArmas Decl. ¶ 2, ECF No.

13

10; FAC ¶ 11.  It is licensed under Health and Safety Code section 1204.  FAC ¶ 11; DeArmas Decl. ¶ 7.  It offers its services free of charge.  DeArmas Decl. ¶¶ 18–19.  It describes itself as a "Christian-based community medical clinic."  *Id.* ¶ 3.  Its objective "is to provide to pregnant women, the community and to others, a Biblically guided and based Christian response to pregnancy, parenting and sexuality."  *Id.* ¶ 4.  According to its bylaws, AWC must not "support nor promote abortion as an acceptable option available to pregnancy, including pregnancy resulting from rape or incest."  *Id.*

"AWC is a religious ministry and is motivated by spiritual concerns."  *Id.* ¶ 18.  It "does not act out of economic interest."  *Id.*  AWC's staff and volunteers sign a statement of faith as part of their application.  *Id.* ¶ 3.  This statement explains the person believes "that the Bible is the only inspired Word of God and is free from error"; that "there is one God, the creator and preserver of all things" and "He exists eternally in three persons: the Father, the Son, and the Holy Spirit, who are of one substance and equal in power and glory"; that "man can only be saved by the grace of God, through faith on the basis of the work of Jesus Christ and by the agency of the Holy Spirit"; and "that human life begins at conception and is valued by God from conception onward."  *Id.*  In short, "all Board Members, officers, employees, and volunteers must be Christians."  *Id.* ¶ 5.

AWC refers to those who seek its services as "patients."  *See, e.g.*, *id.* ¶ 12.  When a patient arrives at AWC, she receives a packet from a receptionist, who leads her to a consultation room.  *Id.*  The receptionist gets to know the patient and confirms AWC's understanding of her expectations for the appointment.  *Id.*  A nurse then gives the patient a "Decision Guide," and the nurse helps the patient complete the guide if necessary.  *Id.*  This decision guide is part of AWC's "holistic (whole person) approach to healthcare," which follows a "PIESS" assessment looking to the patient's "Physical . . . , Intellectual, Emotional, psycho-Social and Spiritual" needs.  *Id.* ¶ 12.  The nurse then shows the patient where and how to complete a pregnancy test.  *Id.*  If the test is positive, the nurse records the patient's vital signs, height, and weight, and reviews the patient's medical history.  *Id.*  If a patient exhibits symptoms of a condition requiring further medical attention, AWC refers her to appropriate treatment.  *Id.*

14

1   AWC then offers education on the patient's medical options using a website, and a nurse offers a

2   same-day ultrasound.  *Id.*  At the conclusion of the appointment, AWC provides any requested

3   educational materials, gives the patient prenatal vitamins, and requests permission to follow up

4   with the patient to learn whether she has obtained prenatal care or an abortion and to confirm her

5   well-being.  *Id.*

6          If a patient is not pregnant, AWC offers information about reproductive health,

7   including menstrual cycles, fertility, methods of birth control, and sexually transmitted diseases

8   and infections.  *Id.* ¶ 15.  AWC offers referrals if the patient requests tests for sexually transmitted

9   diseases and infections.  *Id.*  It recommends sexual abstinence "as the best and safest way for

10   single women to protect their health which includes their sexual/medical, intellectual, emotional,

11   psycho-social and spiritual health."  *Id.*

12          AWC's medical staff consists of medical doctors, obstetricians and gynecologists,

13   and registered nurses.  *Id.* ¶ 10.  It has a Medical Director and Obstetrics Director.  These doctors

14   are available by phone and can consult a patient's medical records and test results.  *Id.* ¶ 17.

15   Tamara DeArmas, AWC's CEO, *id.* ¶ 1, submitted a declaration explaining that "AWC provides

16   accurate evidence-based education to all their patients and does not now nor has it ever

17   knowingly given false or inaccurate medical advice," *id.* ¶ 13.  AWC takes time to ensure each

18   patient has the information she needs to make an informed choice about her pregnancy.  *Id.*

19          Ms. DeArmas also explains that "[r]eferring girls and women, who come through

20   our doors, to where they can get a low cost or free abortion runs directly against the mission and

21   goals of AWC."  *Id.* ¶ 20.  She understands the Act's notice requirements will force AWC "to

22   advertise for the County regarding abortion services against our will."  *Id.*  She finds the notice

23   provisions particularly problematic because, as she understands them, a notice must be posted in

24   the waiting area, and it will be the first message AWC's patients receive.  *Id.*

25          D.      Defendant Harris

26          Defendant Harris is the Attorney General of the State of California.  As noted

27   above, she was one of AB 775's sponsors.  Pls.' Ex. 7, at 1.  Upon passage of AB 775 into law,

28   defendant issued a statement that she was "proud to have co-sponsored the Reproductive FACT

15

1    Act, which ensures that all women have equal access to comprehensive reproductive health care

2    services, and that they have the facts they need to make informed decisions about their health and

3    their lives."  Attorney General Kamala D. Harris Issues Statement on Governor Brown Signing

4    Reproductive FACT Act into Law (Oct. 9, 2015).[8]  She "commend[ed] Governor Brown for

5    signing AB 775 and thank[ed] Assemblymembers David Chiu and Autumn Burke for

6    championing this important law."

7            Under section 123473(a), Defendant will have authority to enforce the Act's notice

8    provisions.  *See* Cal. Health & Safety Code § 123473(a).  She has introduced no evidence and has

9    not argued she will exercise her discretion to defer civil enforcement of the Act against plaintiffs.

10   IV.    JURISDICTION; RIPENESS

11           The State argues this action is unripe such that the court is without jurisdiction.

12   Ripeness is a question of timing.  *See Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d

13   1134, 1138 (9th Cir. 2000) (en banc).  It is a doctrine "designed to 'prevent the courts, through

14   avoidance of premature adjudication, from entangling themselves in abstract disagreements.'"  *Id.*

15   (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)).  It includes "both a constitutional

16   and a prudential component."  *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 902 (9th Cir.

17   1993).  The court addresses each component in turn.

18           A.    Constitutional Ripeness

19           Generally speaking, "the constitutional component of ripeness is synonymous with

20   the injury-in-fact prong of the standing inquiry."  *Cal. Pro-Life Council, Inc. v. Getman*

21   *(Getman)*, 328 F.3d 1088, 1094 n.2 (9th Cir. 2003).  In other words, the constitutional aspects of

22   ripeness may often be characterized as "standing on a timeline."  *Thomas*, 220 F.3d at 1138.  As

23   does the doctrine of standing, ripeness "focuses on whether there is sufficient injury."  *Portman*,

24   995 F.2d at 903.  A sufficient injury is an injury-in-fact: "an invasion of a legally protected

25   _____

26           [8] The court takes judicial notice of this public statement, published on the official website
     for the Office of the Attorney General of the State of California, available currently at
27   https://oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-issues-statement-
     governor-brown-signing.
28

1    interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or

2    hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and quotation

3    marks omitted).  "A claim is not ripe for adjudication if it rests upon contingent future events that

4    may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S.

5    296, 301 (1998) (citation and quotation marks omitted).

6              When a plaintiff challenges a statute's constitutionality, "neither the mere

7    existence of a proscriptive statute nor a generalized threat of prosecution satisfies the 'case or

8    controversy' requirement." *Thomas*, 220 F.3d at 1139.  That is, a statute's passage does not alone

9    make for a ripe claim.  *Id.*  Rather, the plaintiffs must face a "genuine threat of imminent

10   prosecution."  *Id.*  In other words, "[a] plaintiff who challenges a statute must demonstrate a

11   realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement."

12   *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).  "To show such a

13   'realistic danger,' a plaintiff must 'allege[ ] an intention to engage in a course of conduct arguably

14   affected with a constitutional interest, but proscribed by a statute, and . . . a credible threat of

15   prosecution thereunder.'"  *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (quoting *Babbit*,

16   442 U.S. at 298) (alterations in *Lopez*).  The Ninth Circuit has listed three factors that may aid the

17   court's decision on this front: "(1) 'whether the plaintiffs have articulated a concrete plan to

18   violate the law in question,' (2) 'whether the prosecuting authorities have communicated a

19   specific warning or threat to initiate proceedings,' and (3) 'the history of past prosecution or

20   enforcement under the challenged statute.'"  *Getman*, 328 F.3d at 1094 (quoting *Thomas*, 220

21   F.3d at 1139).  Similar considerations inform the court's decision when the question is expressed

22   in terms of standing and injury in fact.  *See, e.g.*, *Lopez*, 630 F.3d at 786.

23             The *Thomas* court took care to clarify that this test allows pre-enforcement

24   challenges of laws that allegedly infringe on a plaintiff's constitutional rights.  220 F.3d at 1137

25   n.1.  Under longstanding federal precedent, a plaintiff need not "await the consummation of

26   threatened injury to obtain preventive relief."  *Getman*, 328 F.3d at 1094; *see also LSO, Ltd. v.*

27   *Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000) ("Courts have found standing where no one had ever

28   been prosecuted under the challenged provision.").  This is particularly true in the context of First

17

1   Amendment free-speech cases. *Getman*, 328 F.3d at 1094; *LSO*, 205 F.3d at 1155.  For example,

2   "when the State of Virginia passed a law banning the display of certain sexually-explicit material

3   where juveniles could examine it, the Supreme Court found that booksellers had standing to

4   object, even though the law had not yet been enforced." *LSO*, 205 F.3d at 1155 (citing *Va. v. Am.*

5   *Booksellers Ass'n, Inc.*, 484 U.S. 383, 386, 392–93 (1988)).  To reach this decision, the Court

6   considered that Virginia "ha[d] not suggested that the newly enacted law will not be enforced"

7   and concluded the plaintiffs had "alleged an actual and well-founded fear that the law will be

8   enforced against them." *Am. Booksellers*, 484 U.S. at 393.

9         Both the Ninth Circuit's decision in *LSO* and the Supreme Court's decision in

10  *American Booksellers* concerned statutes that risked the chilling of constitutionally protected

11  speech.  *See Am. Booksellers*, 484 U.S. at 393; *LSO*, 205 F.3d at 1155–56.  This was also the case

12  in *Getman*.  *See* 328 F.3d at 1094–95.  Here, by contrast, plaintiffs argue the Act compels rather

13  than chills their speech; however, the court sees no reason to distinguish the cases on that basis.

14  The Supreme Court has held that "the right of freedom of thought protected by the First

15  Amendment against state action includes both the right to speak freely and the right to refrain

16  from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  Moreover, the alleged

17  injury motivating the reasoning in *American Booksellers*, *Getman*, and *LSO*—self-censorship—

18  may logically be substituted in this case for the alleged injury of compelled speech; that is, just as

19  a plaintiff may be constitutionally injured by self-censorship, a plaintiff may be injured if

20  compelled to speak.  *See also Riley v. Nat. Fed. of the Blind of N.C.*, 487 U.S. 781, 796–97 (1988)

21  ("There is certainly some difference between compelled speech and compelled silence, but in the

22  context of protected speech, the difference is without constitutional significance . . . .").

23         Here, the Act imposes notice requirements on "licensed covered facilities," which,

24  as set forth above, are defined in three parts: (1) the facility is licensed under California Health

25  and Safety Code section 1204; (2) the facility's "primary purpose is providing family planning or

26

27

28

18

1    pregnancy-related services"; and (3) two or more of the listed conditions are satisfied.[9]  Cal.

2    Health & Safety Code § 123471(a); *see also id.* § 123472(a) (notice requirements).  Under this

3    definition, each of the three plaintiff organizations is a "licensed covered facility."  Each is

4    licensed under Health and Safety Code section 1204.  FAC ¶¶ 9–11.  Each plaintiff's primary

5    purpose is the provision of pregnancy-related services.  *See* Dodds Decl. ¶ 3; Gibbs Decl. ¶ 10;

6    DeArmas Decl. ¶ 4.  And each satisfies two or more of the conditions listed in section 123471(a).

7    *See* Dodds Decl. ¶¶ 9-12, 15, 17 (A Woman's Friend offers and provides obstetric ultrasounds,

8    offers pregnancy testing, and collects health information from clients); Gibbs Decl. ¶¶ 10, 23

9    (CPCNC offers pregnancy tests, obstetric ultrasounds, and "offer[s] abstinence information

10   resources if requested or as needed"); DeArmas Decl. ¶¶ 12, 15 (AWC conducts pregnancy tests,

11   reviews patients' medical history, conducts obstetric ultrasounds, and offers counseling and

12   contraceptive methods).

13           As "licensed covered facilities," all three plaintiffs are subject to the notice

14   requirements of Health & Safety Code section 123472(a).  Should the law be upheld, they will

15   face two choices: comply with the Act's notice provisions come January 1, 2016 or not.  Should

16   plaintiffs elect to comply with the notice provisions, they argue they will be compelled to make a

17   statement contrary to both their religious beliefs and the purposes of their formation.  Should they

18   elect not to comply, they risk an enforcement action and may face civil penalties of five hundred

19   dollars for a first offense and one thousand dollars for each later offense.  *See* Cal. Health &

20   Safety Code § 123472(a) (notice requirements); *id.* § 123473(a) (civil penalty provisions).  The

21   Act is not yet effective, but the State has not suggested it will decline to enforce it.  Indeed it

22   argues that should enforcement of the Act be enjoined, the State would be unable to prevent harm

23

24           [9] Again, those conditions are as follows: "(1) The facility offers obstetric ultrasounds,
     obstetric sonograms, or prenatal care to pregnant women.  (2) The facility provides, or offers
25   counseling about, contraception or contraceptive methods.  (3) The facility offers pregnancy
     testing or pregnancy diagnosis.  (4) The facility advertises or solicits patrons with offers to
26   provide prenatal sonography, pregnancy tests, or pregnancy options counseling.  (5) The facility
     offers abortion services.  (6) The facility has staff or volunteers who collect health information
27   from clients."  Cal. Health & Safety Code § 123471(a) (line breaks removed).

28
                                                    19

1    to "the millions of California women who 'are in need of publicly funded family planning

2    services, contraception services and education, abortion services, and prenatal care and delivery,'

3    but are unaware of the public programs available to provide them with those vital services."

4    Opp'n at 19 (quoting AB 775 § 1(b)).

5            Two of the three *Getman* factors weigh in favor of the claims' ripeness.  One, the

6    plaintiffs have articulated a concrete plan to violate the Act in question.  The court disagrees with

7    the State that plaintiffs have not expressly professed their intent to disobey with the Act's notice

8    provisions.  The plaintiffs' declarations leave no doubt they believe displaying or distributing the

9    notices would conflict with their religious beliefs and the purposes of their organizations.  *See,*

10   *e.g.*, Dodds Decl. ¶¶ 29–31; Gibbs Decl. ¶ 24; DeArmas Decl. ¶ 20; *see also LSO*, 205 F.3d at

11   1156 ("We are not persuaded by the [defendants'] contention that [the plaintiff] was required to

12   plead that a particular . . . licensee had in fact refused to lease premises to [it] . . . .").  Two, the

13   State has in effect communicated its intent to enforce the Act.  *See Getman*, 328 F.3d at 1094.

14   The court recognizes that the state has not, strictly speaking, "communicated a specific warning

15   or threat to initiate proceedings," *id.*, and has not given notice as required by section

16   123473(a)(1), but in light of applicable Supreme Court authority, this shortfall does not yet

17   deprive the court of jurisdiction.  *See, e.g.*, *Am. Booksellers*, 484 U.S. at 393 ("The State has not

18   suggested that the newly enacted law will not be enforced, and we see no reason to assume

19   otherwise.  We conclude that plaintiffs have alleged an actual and well-founded fear that the law

20   will be enforced against them.").  The State has not disavowed plans to enforce the Act.  *See LSO*,

21   220 F.3d at 1155.  Defendant Harris's recent co-sponsorship of the Act, her future role in its

22   enforcement and the absence of any suggestion she will not enforce the Act also show the case is

23   ripe.  *See Bland v. Fessler*, 88 F.3d 729, 737 (9th Cir. 1996).

24           The court finds that although plaintiffs cannot at this time possibly show a history

25   of prosecution or enforcement prior to the Act's taking effect, this action is constitutionally ripe.

26   *See, e.g.*, *LSO*, 205 F.3d at 1155 ("[E]nforcement history alone is not dispositive.  Courts have

27   found standing where no one had ever been prosecuted under the challenged provision.").  This is

28   not a case of uncertainties, hypotheticals, or contingencies.  The parties do not dispute the Act

applies to plaintiffs' organizations.  The Act requires the provision of a specific notice, which the

plaintiffs argue violates specific tenets of their religious beliefs and specific provisions of their

charters or bylaws.  The Act foresees only one consequence of noncompliance: a fine.  The Act

was signed recently and will go into effect on January 1, 2016.  The State has made no effort to

advise the court or plaintiffs it intends not to enforce it against them.  Plaintiffs' alleged

impending injuries suffice to ensure constitutional ripeness.

>     B.     Prudential Ripeness

The prudential component of ripeness "focuses on whether there is an adequate

record upon which to base effective review." *Portman*, 995 F.2d at 902–03.  The decision is

discretionary. *Thomas*, 220 F.3d at 1142.  The court must "evaluate both [1] the fitness of the

issues for judicial decision and [2] the hardship to the parties of withholding court consideration."

*Texas v. United States*, 523 U.S. at 300; *Thomas*, 220 F.3d at 1141 (9th Cir 1991).

>     1.     Fitness for Judicial Decision

The Supreme Court and Ninth Circuit have recognized the difficulty of deciding

constitutional questions without the necessary factual context. *See, e.g.*, *W.E.B. DuBois Clubs of

Am. v. Clark*, 389 U.S. 309, 312 (1967) (per curiam); *Thomas*, 220 F.3d at 1141; *Am.-Arab Anti-

Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 510.

For example, in *W.E.B. Du Bois Clubs*, the Attorney General requested a hearing

and order that the plaintiffs must register as a "communist-front organization."  389 U.S. at 310.

In response, the plaintiffs challenged the statute that granted the Attorney General authority to

make this request. *Id.*  The statute in question provided that before the government could punish

the plaintiffs for failure to register, the "Subversive Activities Control Board," an administrative

agency, was required to find that the plaintiffs in fact operated a communist-front organization

and issue an order to that effect. *Id.* at 311.  And before such an order could issue, the statute

required a full, public evidentiary hearing in which the plaintiffs could be represented by counsel,

present evidence, and conduct cross-examination. *Id.*  The plaintiffs challenged the registration

requirement and sought to enjoin any hearing as unconstitutional. *Id.*  But the Supreme Court

found the action premature because "important and difficult constitutional issues would be

1  decided devoid of factual context" and because it was unclear whether the plaintiffs were covered

2  by the statute.  *Id.* at 312.

3            Similarly, in *American-Arab Anti-Discrimination Committee*, the U.S.

4  Immigration and Naturalization Service (INS) detained the plaintiffs, who were non-immigrant

5  aliens, because they were members of the Popular Front for the Liberation of Palestine (PFLP).

6  970 F.2d at 504–05.  The government alleged the PFLP advocated and taught the "international

7  and governmental doctrines of world communism," which meant the detainees would be

8  deported.  *Id.* at 505.[10]  Citing *W.E.B. DuBois Clubs*, the Ninth Circuit found the case was not

9  ripe.  *Id.* at 510–12.  It was unclear to the court whether the detainees were actually members of

10 the PFLP and what actions had allegedly brought them within the parameters of the statute in

11 question.  *Id.* at 510–11.  In addition, the statute had never been interpreted by any court.  *Id.* at

12 511.  Neither had the INS offered an interpretation.  *Id.*

13           In *Thomas v. Anchorage Equal Rights Commission*, several landlords challenged

14 an Alaska statute that banned discrimination on the basis of marital status, arguing the statute

15 violated the First Amendment's Free Exercise and Free Speech Clauses.  220 F.3d at 1137.  The

16 Ninth Circuit found the case was not ripe.  *Id.*  It summarized its holding as follows:

17           No prospective tenant has ever complained to the landlords, let
           alone filed a complaint against them.  Neither the Alaska State
18           Commission for Human Rights nor the Anchorage Equal Rights

19 _____
           [10] At the time, 8 U.S.C. § 1251 provided as follows, in relevant part:

20 (a) Any alien in the United States . . . shall, upon order of the Attorney General,
   be deported who—
21
   . . .
22 (6) is or at any time has been, after entry, a member of the following classes of
   aliens:
23
   . . .
24 (D) Aliens . . . who are members of or affiliated with any organization that
   advocates the economic, international, and governmental doctrines of world
25 communism or the establishment in the United States of a totalitarian dictatorship,
   either through its own utterances or through any written or printed publications
26 issued or published by or with the permission or consent of or under the authority
   of such organization or paid for by the funds of, or funds furnished by, such
27 organization . . . .

28                                            22

> Commission has ever initiated an investigation into the landlords' rental practices or commenced a civil enforcement action or criminal prosecution under the challenged laws.  No violation of the laws is on the horizon and no enforcement action or prosecution is either threatened or imminent.  Indeed, the principal enforcement agencies had never even heard of these landlords before they filed this action.  Simply put, at this stage the dispute is purely hypothetical and the injury is speculative.

*Id.*  Later on in the circuit court's opinion, it called the record before it "remarkably thin and sketchy, consisting only of a few conclusory affidavits."  *Id.* at 1141.

In *Thomas,* the court acknowledged that some pre-enforcement actions may be ripe from a prudential point of view, especially if they concern "purely legal" issues.  *Id.* at 1141–42; *accord San Diego Cty. Gun Rights Comm.*, 98 F.3d at 1132 ("[P]ure legal questions that require little factual development are more likely to be ripe.").  But that was not the situation in *Thomas*; no "concrete factual scenario" demonstrated how the laws, as applied, infringed the landlords' constitutional rights.  *Id.*

Here, unlike in *W.E.B. DuBois Clubs*, *American-Arab Anti-Discrimination Committee*, and *Thomas*, plaintiffs' claims are concrete and clearly delineated by evidence, including their declarations, the text of the Act, and the Act's legislative history.  Plaintiffs' declarations are detailed, specifying what they understand the Act will require of them and how the notice provisions they challenge conflict with their constituents' religious convictions and provisions of their charters and bylaws.  Moreover, the disputes here concern questions for which the record includes sufficient evidence:  the scope of the protection provided by the First Amendment's Free Exercise and Freedom of Speech Clauses given a specific notice required by California law.

The State's arguments to the contrary are framed in only general terms.  It argues the plaintiffs' claims "appear to include as-applied components" and therefore it believes adjudication of this case "depends on the facts surrounding any conceivable application of the statute."  Opp'n at 7.  But the State identifies no particular difficulty or uncertainty that will arise if the case goes forward now.  The court also notes other federal courts have recently adjudicated similar disputes, apparently without the sort of difficulties that arise in unripe cases.  *See, e.g.*,

1   *Evergreen Ass'n of N.Y. v. City of N.Y.*, 740 F.3d 233 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 435

2   (2014); *Greater Balt. Ctr. v. Mayor and City Council of Balt.*, 721 F.3d 264 (4th Cir. 2013) (en

3   banc).  This case is suited for judicial decision now.

4               2.      Hardship to the Parties Should the Court Withhold Consideration

5               As noted above, the prudential ripeness doctrine also countenances the court's

6   consideration of whether the parties will suffer a hardship if the court withholds a decision.

7   *Texas v. United States*, 523 U.S. at 300–01.  This analysis "dovetails, in part, with the

8   constitutional consideration of injury."  *Thomas*, 220 F.3d at 1142.

9               When a plaintiff challenges a statute or regulation, hardship is more likely if the

10  statute has a direct effect on the plaintiff's day-to-day operations.  *See Texas v. United States*,

11  523 U.S. at 301.  Hardship is less likely if the statute's effect is abstract.  *See id.* (rejecting

12  argument that ongoing "threat to federalism" or "threat to personal freedom" could constitute

13  hardship "unless the person's primary conduct is affected").  The court may also consider whether

14  the parties' dispute may be adjudicated more concretely in a later proceeding, or if the denial of

15  relief would foreclose later resolution.  *See Thomas*, 220 F.3d at 1142; *Am.-Arab Anti-*

16  *Discrimination Comm.*, 970 F.2d at 511.

17              Here, the court is satisfied the plaintiffs stand to suffer a hardship should the court

18  withhold a decision.  The Act impacts the plaintiffs' day-to-day operations by requiring they

19  either post a notice, hand out a printed notice, or provide digital notice.  Starting January 1, 2016,

20  the plaintiffs face a difficult decision: display a notice they argue violates their First Amendment

21  rights or risk stiff civil penalties.  The State has identified no specific advantage associated with

22  delaying this litigation.

23              This case is ripe from both constitutional and prudential perspectives.  The court

24  thus proceeds to the merits of plaintiffs' motion.

25  V.      LEGAL STANDARD

26              A preliminary injunction is an extraordinary remedy awarded only upon a clear

27  showing the moving party is entitled to such relief.  *Winter v. Natural Res. Defense Council, Inc.*,

28  555 U.S. 7, 22 (2008).  Federal Rule of Civil Procedure 65 provides a court may issue a

1   preliminary injunction to preserve the relative position of the parties pending a trial on the merits.

2   *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  The party seeking a preliminary

3   injunction must show it is "likely to succeed on the merits," "likely to suffer irreparable harm in

4   the absence of the preliminary relief," "the balance of equities tips in [its] favor," and "an

5   injunction is in the public interest."  *Winter*, 555 U.S. at 20.

6            Alternatively, in the Ninth Circuit, if a plaintiff cannot show a likelihood of

7   success but can show "serious questions going to the merits" with the "balance of hardships

8   tip[ping] *sharply* in the plaintiff's favor," and can satisfy the other two *Winter* factors, then a

9   preliminary injunction can also be proper.  *Shell Offshore, Inc. v. Greenpeace, Inc*., 709 F.3d

10   1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

11   1134–35 (9th Cir. 2011) (finding the "serious question" sliding scale test survived *Winter*))

12   (emphasis in *Shell*).  Lastly, a court need not reach the other prongs if the moving party cannot as

13   a threshold matter demonstrate a "fair chance of success on the merits."  *Pimentel v. Dreyfus*, 670

14   F.3d 1096, 1111 (9th Cir. 2012) (quoting *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2008)

15   (internal quotation marks omitted).

16            In deciding on whether to grant a preliminary injunction, the court may rely on

17   declarations, affidavits, and exhibits, among other things, and such evidence does not need to

18   conform to the standards of Federal Rule of Civil Procedure 56.  *Johnson v. Couturier*, 572 F.3d

19   1067, 1083 (9th Cir. 2009); *see also Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.

20   1984) ("The trial court may give even inadmissible evidence some weight, when to do so serves

21   the purpose of preventing irreparable harm before trial"); *Bracco v. Lackner*, 462 F. Supp. 436,

22   442 n.3 (N.D. Cal. 1978) (evidence considered in ruling on preliminary injunction does not need

23   to conform to standards for summary judgment).  "The urgency necessitating the prompt

24   determination of the preliminary injunction; the purpose of a preliminary injunction, to preserve

25   the status quo without adjudicating the merits; and the [c]ourt's discretion to issue or deny a

26   preliminary injunction are all factors supporting the considerations of affidavits."  *Bracco*, 462 F.

27   Supp. at 442 n.3.  The trial court has discretion to decide how much weight to give to each

28

1 | affiant's statement.  *See Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377

2 | (9th Cir. 1985).

3 | VI.     LIKELIHOOD OF SUCCESS ON THE MERITS

4 |        A.     Claim One: First Amendment Freedom of Speech

5 |               The court first considers plaintiffs' likelihood of success on their free speech

6 | claim.  The parties disagree about the appropriate level of scrutiny to apply to the Act.  Plaintiffs

7 | contend the Act is subject to strict scrutiny because the required notice amounts to a content-

8 | based regulation.  "Mandating speech that a speaker would not otherwise make necessarily alters

9 | the content of the speech."  *Riley, supra*, 487 U.S. at 795.  Accordingly, laws compelling speech

10 | are considered to be content-based regulations generally subject to strict scrutiny, albeit with

11 | some exceptions.[11]  *Id.*; *see also Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994).  The

12 | State argues the court should instead adopt one of the lesser levels of scrutiny applicable to either

13 | compelled commercial speech, professional conduct, professional speech within the confines of

14 | the patient-provider relationship, or abortion-related disclosures.  At hearing, the State, while

15 | maintaining its position that the speech at issue is both commercial and professional,

16 | acknowledged that of the two doctrines, professional speech is the better fit.

17 |               As discussed below, after considering the alternatives, the court finds the Act

18 | regulates professional speech within the confines of the patient-provider relationship, which is

19 | reviewed under no greater than intermediate scrutiny.  The court next finds the Act survives

20 | intermediate scrutiny for professional speech and would likely survive even strict scrutiny for

21 | fully protected speech.  The court concludes plaintiffs are not likely to succeed on the merits of

---

23 |        [11]  "[T]he violation of the First Amendment is all the more blatant" when the government targets particular views taken by speakers on the subject.  *Rosenberger v. Rector*, 515 U.S. 819,

24 | 829 (1995) ("Viewpoint discrimination is . . . an egregious form of content discrimination.").  Plaintiffs do not appear to argue that the Act discriminates based on their viewpoint, and the

25 | record does not suggest the State's rationale for the Act was to discriminate against a certain viewpoint.  The required notice notifies the public about the full spectrum of reproductive health

26 | care services available in California and does not express an ideological viewpoint on the services mentioned.  In addition, the Act also applies to all pregnancy-related health providers regardless

27 | of their beliefs on abortion.

28 |

1  their free speech claim, but have raised serious questions going to the merits under the Ninth

2  Circuit's "serious questions" approach.

3        1.  <u>Commercial Speech</u>

4          a)  <u>Legal Standard</u>

5      Content-based regulations are subject to lesser scrutiny when they concern

6  commercial speech.  Compelled commercial speech is subject to either intermediate scrutiny,

7  *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 563–66 (1980), or, if the

8  law compels disclosure of "purely factual and uncontroversial information," rational basis review,

9  *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985)

10  ("[A]n advertiser's rights are adequately protected as long as disclosure requirements are

11  reasonably related to the State's interest in preventing deception of consumers."); *see also*

12  *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 248–53 (2010).  The Supreme

13  Court has articulated several justifications for its differential treatment of commercial speech: an

14  advertiser may easily verify the truth of the information it disseminates about a specific product

15  or service, *Central Hudson Gas*, 447 U.S. at 564 n.6; *Virginia State Bd. of Pharmacy*, 425 U.S. at

16  772 n.24; commercial speech may be more durable and less likely to be chilled than other types

17  of speech due to the advertiser's economic self-interest, *Central Hudson Gas*, 447 U.S. at 564

18  n.6; *Virginia State Bd. of Pharmacy*, 425 U.S. at 772 n.24; and the State has an interest in

19  regulating the underlying commercial transaction, *Edenfield v. Fane*, 507 U.S. 761, 767 (1993).

20      The Supreme Court has defined commercial speech as "expression related solely

21  to the economic interests of the speaker and its audience," *Central Hudson Gas*, 447 U.S. at 561,

22  and as speech that "does no more than propose a commercial transaction," *Va. State Bd. of*

23  *Pharmacy,* 425 U.S. at 752; *see also Bolger v. Youngs Drug Prods.* Corp., 463 U.S. 60, 66 (1983)

24  (describing proposal of a commercial transaction as "the core notion of commercial speech"); *Am.*

25  *Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004) (reviewing definition of

26  commercial speech).  However, the Court has recognized the difficulty of "drawing bright lines

27  that will clearly cabin commercial speech as a distinct category."  *City of Cincinnati v. Discovery*

28  *Network, Inc*., 507 U.S. 410, 419 (1993).  Accordingly, when it is not clear whether speech is

1    commercial, the Court in *Bolger* set out three factors relevant to the determination: (i) whether the

2    speech is an advertisement, (ii) whether the speech refers to a specific product, and (iii) whether

3    the speaker has an economic motive for the speech.  463 U.S. at 66–68; *see also Ass'n of Nat.*

4    *Advertisers, Inc. v. Lungren*, 44 F.3d 726, 728 (9th Cir. 1994) (reviewing *Bolger* factors).  While

5    "[t]he combination of all these characteristics . . . provides strong support for the . . . conclusion

6    that [speech is] properly characterized as commercial speech," *Bolger*, 463 U.S. at 67, it is not

7    necessary that each of the characteristics "be present in order for speech to be commercial," *id*. at

8    67 n.14.  When commercial speech is "inextricably intertwined with otherwise fully protected

9    speech," the court applies the test for fully protected expression. *Riley*, 487 U.S. at 796.  "Our

10   lodestars in deciding what level of scrutiny to apply to a compelled statement must be the nature

11   of the speech taken as a whole and the effect of the compelled statement thereon." *Id*.  The court

12   does not "parcel out the speech, applying one test to one phrase and another test to another

13   phrase." *Id*.

14            The context of the speech affected also plays a role in a court's decision.  For

15   example, in *Riley*, the Supreme Court considered whether North Carolina had impermissibly

16   compelled disclosures by professional fundraisers and noted "the context of a verbal solicitation":

17   "if the potential donor is unhappy with the disclosed percentage" of charitable contributions

18   collected during the previous 12 months that were actually turned over to charity, "the fundraiser

19   will not  likely be given a chance to explain the figure; the disclosure will be the last words

20   spoken as the donor closes the door or hangs up the phone." *Id*. at 799–800.  Referencing *Riley*,

21   the Second Circuit in *Evergreen* considered the fact that the compelled speech was to be made in

22   the context of the "public debate over the morality and efficacy of contraception and abortion."

23   *Evergreen, supra*, 740 F.3d at 249; *see also NAACP v. Claiborne Hardware Co*., 458 U.S. 886,

24   913 (1982) ("[E]xpression on public issues has always rested on the highest rung on the hierarchy

25   of First Amendment values.").

26

27

28

b)      Analysis

Here, each plaintiff clinic has submitted a declaration stating it does not charge

fees for any of its services or otherwise conduct commercial transactions.  The declaration of

AWC, for example, avers

> AWC does not charge any fee to girls and women who use its services, providing all of its services free of charge.  Additionally, AWC does not solicit a donation from girls or women who are at the clinic seeking services.   Moreover, AWC does not have a cashier to receive a payment from a patient should a girl or woman attempt to pay for services.   In sum, AWC is a religious ministry and is motivated by spiritual concerns and does not act out of economic interest.
>
> To be clear, there are no monetary transactions between the patients and those at the clinic. . . .

DeArmas Decl. ¶¶ 18–19.  Similarly, Ms. Dodds and Ms. Gibbs state that A Woman's Friend and

CPCNC, respectively, provide all of their services free of charge.  *See* Dodds Decl. ¶ 28; Gibbs

Decl. ¶ 22.

Rather than being driven by an economic motive, the declarations state that the

clinics' motivation is "spiritual," DeArmas Decl. ¶ 18; Dodds Decl. ¶ 28, and "to help women and

men in need," Gibbs Decl. ¶ 22.  The plaintiff clinics are all religiously based organizations, and

their services are guided by their religious beliefs.  *See* DeArmas Decl. ¶¶ 2–4 (stated objective is

to provide Biblically guided and Christian response to pregnancy); Dodds Decl. ¶¶ 2, 4, 10, 12,

19, 23; Gibbs Decl. ¶¶ 2–7 (clinic provides Christ-centered support).  During client appointments,

the declarations state that the plaintiff clinics provide their clients with accurate information about

pregnancy, abortion, and other health topics.  *See, e.g.,* DeArmas Decl. ¶¶ 13–15; Dodds Decl. ¶¶

3, 12, 16, 21, 25; Gibbs Decl. ¶¶ 10, 13, 21, 23.  This includes counseling clients through their

health and pregnancy decisions and presenting them with alternatives to abortion.  *See* DeArmas

Decl. ¶¶ 4, 15; Dodds Decl. ¶¶ 2–3 (purpose of clinic is to help a woman work through

alternatives when she experiences unplanned pregnancy); Gibbs Decl. ¶¶ 5–6, 20–21.  In the

course of client counseling, the plaintiff clinics do not support or promote abortion as an

acceptable alternative to pregnancy.  *See* DeArmas Decl. ¶¶ 4, 20; Dodds Decl. ¶ 3; Gibbs Decl.

¶¶ 6, 9, 24.

1          Based on the limited evidence before the court at this stage, plaintiffs have shown

2   that their speech is non-commercial.  First, plaintiffs' speech is not consistent with the core notion

3   of commercial speech: it does not appear to relate solely to their economic interests, *see Central*

4   *Hudson Gas,* 447 U.S. at 561, and does not simply propose a commercial transaction, *see Va.*

5   *State Bd. of Pharmacy*, 425 U.S. at 762.  Neither is plaintiffs' speech commercial under the three

6   *Bolger* factors.  Under the first two factors, at least some of plaintiffs' speech relates to the

7   solicitation of clients for patronage of their medical services, which several courts have found to

8   constitute an advertisement for a "specific product," *see, e.g., Am. Acad. of Pain Mgmt*, 353 F.3d

9   at 1106; *Fargo Women's Health Organization, Inc. v. Larson*, 381 N.W.2d 176, 180–81 (N.D.

10  1986).  However, plaintiffs appear to have no economic motive for their speech under the third

11  factor, because they do not charge any fees for their services or use their services to solicit

12  donations directly.  In addition, the nature of plaintiffs' services and speech bears little

13  resemblance to other contexts in which courts have applied the commercial speech doctrine.  *See,*

14  *e.g., New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 131–36 (2d Cir.

15  2009) (requiring restaurants to post calorie-content information on menus); *Nat'l Elec. Mfrs.*

16  *Ass'n v. Sorrell*, 272 F.3d 104, 113–14 (2d Cir. 2011) (requiring manufacturers to label products

17  and packaging to inform consumers products contain mercury); *Zauderer*, 471 U.S. at 626

18  (requiring lawyers to include statement on advertisements for contingency-fee-based

19  representation that client faces potential liability for legal costs if the lawsuit is unsuccessful).

20  Here, the clinics' activities are integrally connected to their religious and political beliefs, and the

21  speech required by the Act brushes up against a controversial public debate revolving around

22  abortion.  *Evergreen*, 740 F.3d at 249.

23          Although the State suggests the goods or services plaintiffs provide have value and

24  argue this value is sufficient for a transaction to be considered commercial, even if no money is

25  exchanged, the State cites no authority for this proposition in the free speech context.[12]  *Cf.*

---

26      [12]   The State cites cases finding that non-profits engaged in "commerce" within the

27  meaning of the Commerce Clause or antitrust laws.  *See* ECF No. 16 at 10–11 (citing *Camps*

28  *Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564 (1997) (Commerce Clause),

1    Black's Law Dictionary (9th ed. 2009) (defining commerce as the "exchange," as opposed to free

2    provision, "of goods and services").  Indeed, other district courts have expressed concern that

3    such a definition would expand the commercial speech doctrine too far, and diminish the

4    constitutional protection for speech made by organizations such as churches, which distribute

5    goods of value to their members for religious purposes.  *See Evergreen Ass'n, Inc. v. City of N.Y.*,

6    801 F. Supp. 2d 197, 205 (S.D.N.Y. 2011), *aff'd in part, vacated in part*, 740 F.3d 233 (2d Cir.),

7    *cert. denied*, 135 S. Ct. 435 (2014); *O'Brien v. Mayor & City Council of Balt.*, 768 F. Supp. 2d

8    804, 814 (D. Md. 2011), *aff'd sub nom. Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor*

9    *& City Council of Balt.*, 683 F.3d 539 (4th Cir. 2012), *aff'd in part, vacated in part en banc*, 721

10   F.3d 264 (4th Cir. 2013); *cf. Tepeyac v. Montgomery Cty.*, 779 F. Supp. 2d 456, 464 (D. Md.

11   2011), *aff'd in part, rev'd in part*, 683 F.3d 591 (4th Cir. 2012), *aff'd en banc sub nom. Centro*

12   *Tepeyac v. Montgomery Cty.*, 722 F.3d 184 (4th Cir. 2013).  The court likewise declines to adopt

13   the expanded definition of commercial speech the State advances.

14          Even if the court assumes some of plaintiffs' speech is commercial under a broad

15   reading of the *Bolger* factors, the Act potentially impacts additional types of speech beyond

16   advertisement of the clinics' medical services.  Because the Act requires plaintiffs to disseminate

17   the written notice on site, the Act may have some potential to impact the communications

18   plaintiffs typically make to their clients during clinic visits, including protected informative and

19   ideological speech relating to abortion.  Plaintiffs' declarations state the clinics provide their

20   clients with accurate information about pregnancy, abortion, and other health topics, and that they

21   counsel their clients through their pregnancy decisions from a Christian perspective.  As a result,

22   plaintiffs' speech bears some resemblance to the charitable solicitations at issue in *Riley, supra*.

23   In *Riley*, the Supreme Court recognized that "solicitation is characteristically intertwined with

24

25   and *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.- Connecticut*, 156 F.3d 535 (4th Cir. 1998)
     (antitrust laws)).  However, courts apply a different definition of "commerce" and consider
26   different policy considerations in classifying speech as commercial speech in the Commerce
     Clause and antitrust environments, as contrasted to the free speech context here.  *See Camps*
27   *Newfound/Owatonna, Inc*., 520 U.S. at 573–74; *Virginia Vermiculite, Ltd*., 156 F.3d at 540–41.

28

1   informative and perhaps persuasive speech." 487 U.S.. at 796 (citation omitted).  The Court held

2   that speech does not retain its commercial character when it is so intertwined with fully protected

3   speech that the court cannot parcel out one component part of speech from another.  *Id*.  Here, as

4   in *Riley*, it would be "artificial and impractical" to try to separate plaintiffs' speech intended to

5   solicit patronage of its services from its informative or persuasive speech.  *See id*.  Accordingly,

6   plaintiffs have established at least a colorable claim that any arguably commercial speech they

7   make during the course of client visits is "inextricably intertwined with otherwise fully protected

8   speech," and thus has lost its purely commercial character.  *See Centro Tepeyac*, 722 F.3d at 189.

9   The intermediate level of scrutiny established in *Central Hudson Gas*, 447 U.S. at 563–66,

10   therefore does not apply.

11        In addition, because plaintiffs' speech is not "commercial," it is not appropriate to

12   apply the rational basis test articulated in *Zauderer*, 471 U.S. at 651.  Although the State contends

13   "[a] non-profit can just as easily deceive a consumer of pregnancy-related services as a for-profit

14   entity," ECF No. 16 at 11, and "[m]andated disclosure of accurate, factual, commercial

15   information does not offend the core First Amendment values," *id*. at 12 (quoting *Nat'l Elec.*

16   *Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113–14 (2d Cir. 2011)), *Zauderer's* rational basis test only

17   applies in the commercial context.  In *Hurley v. Irish–American Gay, Lesbian & Bisexual Group*

18   *of Boston*, 515 U.S. 557 (1995), the Supreme Court clarified:

19        Although the State may at times prescribe what shall be orthodox in
         commercial advertising by requiring the dissemination of 'purely
20        factual and uncontroversial information,' outside that context it may
         not compel affirmance of a belief with which the speaker disagrees.
21        Indeed this general rule, that the speaker has the right to tailor the
         speech, applies not only to expressions of value, opinion, or
22        endorsement, but equally to statements of fact the speaker would
         rather avoid, subject, perhaps to the permissive law of defamation.
23

24   *Id*. at 573 (citations omitted) (quoting *Zauderer*, 471 U.S. at 651); *cf. Riley*, 487 U.S. at 796 n.9

25   ("Purely commercial speech is more susceptible to compelled disclosure requirements.").

26   Moreover, the factual nature of the information in the notice does not in itself entitle the Act to

27   rational basis review.  In *Riley*, the Supreme Court held that a required disclosure is not upheld

28   simply because it involves compelled statements of fact, rather than opinions.  487 U.S. at 797–98

32

1    (reasoning that both compelled statements of opinion and compelled statements of fact burden

2    protected speech).

3              In sum, the Act is not subject to intermediate scrutiny for the regulation of

4    commercial speech, or rational basis review for laws requiring the disclosure of "purely factual

5    and uncontroversial information" under *Zauderer*.

6                        2.    Professional Speech

7              Courts have construed the First Amendment as allowing some leeway for the state

8    to regulate professionals to protect the health, morals, and general welfare of its citizens, even if

9    the state's regulation has an incidental effect on protected speech or other constitutional rights.

10   *See, e.g., Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 881–84 (1992) (plurality

11   opinion); *Shea v. Bd. of Med. Examiners*, 81 Cal. App. 3d 564, 577 (1978).  However, the

12   Supreme Court has never directly addressed the appropriate level of scrutiny for professional

13   speech regulations, and the framework for professional speech remains murky at best.  The Ninth

14   Circuit's decision in *Pickup v. Brown*, 740 F.3d 1208 (2013), articulates some guiding principles

15   and establishes a continuum of protection for professional speech.  But because *Pickup* ultimately

16   addressed professional conduct, *id.* at 1229, uncertainty still exists as to what level of scrutiny

17   applies at the midpoint of protection, especially in the context of abortion-related disclosures.

18   Circuit courts are currently split as to whether *Casey* announced a distinct "reasonableness" test

19   for mandated disclosures that provide truthful, non-misleading information relevant to a patient's

20   decision to have an abortion, and the Ninth Circuit has not reached the issue.

21             Here, the court first finds the Act regulates what is best characterized as

22   professional speech, and the speech lands at the midpoint of the continuum described in *Pickup v.*

23   *Brown*.  The court next finds the applicable level of scrutiny is either intermediate scrutiny or the

24   less-demanding "reasonableness" test under *Casey*.  The court need not decide which of the two

25   tests applies, because the court ultimately holds the Act survives intermediate scrutiny.

26                        a)    Does The Act Regulate Professional Speech?

27             Although the Supreme Court has not articulated a precise test for what constitutes

28   professional speech, several lower courts have looked to Justice Jackson's concurrence in *Thomas*

33

v. *Collins*, 323 U.S. 516 (1945), and Justice White's concurrence in *Lowe v. SEC*, 472 U.S. 181

(1985), for guidance.  *See, e.g., Wollschlaeger v. Governor of the State of Fla.*, No. 12-14009,

___F.3d___, 2015 WL 8639875, at *20 (11th Cir. Dec. 14, 2015); *Pickup*, 740 F.3d at 1228;

*Accountant's Soc. of Va. v. Bowman*, 860 F.2d 602, 604 (4th Cir. 1988) (Justice White's

concurrence provides "sound, specific guidelines" for defining professional speech); *Locke v.*

*Shore*, 682 F. Supp. 2d 1283, 1291–92 (N.D. Fla. 2010), *aff'd*, 634 F.3d 1185 (11th Cir. 2011); *In*

*re Rowe*, 80 N.Y.2d 336, 342 (Ct. App. 1992).

        In *Thomas*, Justice Jackson said,

> [A] rough distinction [between a valid professional regulation and an impermissible restriction on speech] always exists, I think, which is more shortly illustrated than explained.  A state may forbid one without its license to practice law as a vocation, but I think it could not stop an unlicensed person from making a speech about the rights of man or the rights of labor, or any other kind of right . . . . Likewise, the state may prohibit the pursuit of medicine as an occupation without its license but I do not think it could make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought.

323 U.S. at 544–45 (Jackson, J., concurring); *see also Bailey v. Huggins Diagnostic & Rehab.*

*Ctr., Inc.*, 952 P.2d 768, 773 (Colo. Ct. App. 1997) (holding that First Amendment does not

permit a court to hold a dentist liable for statements published in book or made during news

program, even when statements were contrary to opinion of medical establishment); *cf.* Robert

Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician*

*Speech*, 2007 U. Ill. L. Rev. 939, 949 (2007) ("When a physician speaks to the public, his

opinions cannot be censored and suppressed, even if they are at odds with preponderant opinion

within the medical establishment.").  Building on Justice Jackson's statement, Justice White in

*Lowe* wrote:

> One who takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client's individual needs and circumstances is properly viewed as engaging in the practice of a profession.  Just as offer and acceptance are communications incidental to the regulable transaction called a contract, the professional's speech is incidental to the conduct of the profession.

472 U.S. at 232 (White, J., concurring); *cf. Pickup*, 740 F.3d at 1228.

1          Courts have interpreted these concurrences as describing two characteristics that

2   can make a person's speech "professional" under the First Amendment: being a member of a

3   profession, and having a quasi-fiduciary relationship with a client.  *See, e.g., Wollschlaeger*, 2015

4   WL 8639875, at *19; *accord Pickup*, 740 F.3d at 1228–29.  For example, in *Evergreen, supra*,

5   the district court concluded the pregnancy center plaintiffs did not engage in professional speech

6   because they were not licensed to practice medicine and did not tailor their services to the

7   individual needs and circumstances of their clients.  801 F. Supp. 2d at 207 (considering

8   mandatory disclosures about the clinics' medical licensing status and services offered).  The

9   district court in *Tepeyac v. Montgomery County* similarly interpreted the concurrences in *Thomas*

10   and *Lowe*, *supra*, as suggesting that "speech may be labeled 'professional speech' when it is

11   given in the context of a quasi-fiduciary—or actual fiduciary—relationship, wherein the speech is

12   tailored to the listener and made on a person-to-person basis."  779 F. Supp. 2d at 467.  The court

13   concluded the clinic in that case did not engage in professional speech because it provided general

14   pregnancy-related information, rather than individualized advice tailored to particular cases.  *Id.*

15          Here, the challenged provision of the Act applies only to "licensed covered

16   facilities."  Cal. Health & Safety Code § 123472(a).  As described above, a licensed covered

17   facility is defined as a facility licensed under California Health and Safety Code section 1204, or

18   an intermittent clinic operating under a primary care clinic as provided by subdivision (h) of

19   section 1206.  *Id.* § 123471(a).  For a clinic to be licensed, an applicant must provide

20   "[d]iagnostic, therapeutic, radiological, laboratory and other services for the care and treatment of

21   patients for whom the clinic accepts responsibility."  Cal. Code Regs. tit. 22, § 75026.  In

22   addition, "[e]very medical clinic shall have a licensed physician designated as the professional

23   director," and "[a] physician, physician's assistant or a registered nurse shall be present whenever

24   medical services are provided."  *Id.* § 75027.  Unlike the pregnancy centers in *Evergreen* and

25   *Tepeyac*, plaintiffs' declarations here establish that each clinic holds a medical license in the State

26   of California, has Licensed Medical personnel on staff, and provides medical services.  *See*

27   DeArmas Decl. ¶¶ 7, 10–17; Dodds Decl. ¶¶ 10, 14–22, 27, 29; Gibbs Decl. ¶¶ 9, 10, 14–17.

28

1    These facts weigh in favor of treating the relationship between plaintiffs and their clients or

2    patients as a professional relationship.

3              Moreover, under the test provided in Justice White's concurrence in *Lowe*,

4    plaintiffs appear to "exercise judgment on behalf of the client in the light of the client's individual

5    needs and circumstances," 472 U.S. at 232 (White, J., concurring), creating a quasi-fiduciary

6    relationship with their clients.  For example, as noted above, plaintiff AWC performs a holistic

7    Physical, Intellectual, Emotional, psycho-Social, and Spiritual (PIESS) assessment of each patient

8    and reviews each patient's medical history.  DeArmas Decl. ¶ 12.  AWC's doctors are available

9    to consult "specific patient ultrasound findings, medical documentation and needs."  *Id.* ¶ 17.

10   Similarly, registered nurses at A Woman's Friend create a medical chart and take a medical

11   history and assessment of each client.  Dodds Decl. ¶¶ 14–15, 19.  CPCNC offers a variety of

12   health services "depending upon the needs and requests of the client."  Gibbs Decl. ¶ 10.  A

13   volunteer medical director signs off on the clinic's ultrasounds, accepts referrals for clients in

14   need of prenatal care, and connects with the nurse sonographer "for specific needs for the center

15   or clients."  *Id.* ¶ 15.  Each clinic counsels each woman so she understands the alternatives to

16   abortion and makes the best choice for her particular pregnancy.  *See* DeArmas Decl. ¶ 13; Dodds

17   Decl. ¶ 3; Gibbs Decl. ¶ 21.

18             Plaintiffs' licensing status and the facts provided in their declarations support the

19   characterization of their communications as professional speech uttered in the context of

20   individualized client care, as described in the concurrences in *Thomas* and *Lowe*.  Although the

21   compelled speech may be disseminated by staff in the waiting room rather than by a doctor in the

22   examining room, the State's regulatory licensing structure extends to the clinic as a whole, and

23   the individualized medical relationship between plaintiffs and their clients can properly be

24   characterized as extending at least as far as the walls of the clinic.  In addition, the content of the

25   required notice itself relates to the medical profession, because it provides information relevant to

26   patients' medical decisions.  The Act is therefore properly analyzed under the precedent on

27   professional speech.   The court next considers how plaintiffs' professional speech should be

28   categorized under *Pickup v. Brown*.

1              b)      *Pickup* Continuum

2              In *Pickup v. Brown*, the Ninth Circuit described the First Amendment protection

3      available to professionals with reference to a continuum.  At one end of the continuum, First

4      Amendment protection is at its greatest where a professional is engaged in public dialogue on

5      matters of public concern.  740 F.3d at 1227.  At the midpoint, First Amendment protection of a

6      professional's speech is "somewhat diminished" within the confines of a professional

7      relationship.  *Id*. at 1228.  Examples of this type of speech include informed consent

8      requirements, licensing requirements, professional disciplinary proceedings, and negligence

9      actions.  *Id*.  At the other end of the continuum, the state's power is at its greatest where the state

10     primarily regulates professional conduct, such as prohibiting the administration of certain drugs

11     or forms of treatment.  *Id*. at 1229.  Other circuits have made similar distinctions when deciding

12     the appropriate level of scrutiny to apply to laws regulating professional speech.  *See Stuart v.*

13     *Camnitz*, 774 F.3d 238, 248 (4th Cir. 2014), *cert. denied sub nom. Walker-McGill v. Stuart*, ___

14     U.S. ___, 135 S. Ct. 2838 (2015); *King v. Governor of the State of New Jersey*, 767 F.3d 216,

15     224–29, 233–37 (3d Cir. 2014), *cert. denied sub nom. King v. Christie*, 135 S. Ct. 2048 (2015);

16     *Wollschlaeger*, 2015 WL 8639875, at *20–21.

17             In *Pickup*, the Ninth Circuit determined that a statute prohibiting licensed health

18     providers from offering sexual orientation change efforts (SOCE) therapy to minors landed at the

19     conduct end of the continuum, even though the treatment was performed in part through the

20     spoken word.  *See* 740 F.3d at 1229.  Because the regulated activities were therapeutic, not

21     symbolic, the court reasoned they were not "an act of communication" that transforms conduct

22     into First Amendment speech.  *See id*. at 1230 (quoting *Nev. Comm'n on Ethics v. Carrigan*, ___

23     U.S. ___, 131 S. Ct. 2343, 2350 (2011)).  The court compared the statute to a ban on a particular

24     drug: the ban primarily regulates conduct, even though it has the incidental effect of prohibiting a

25     doctor from using words to write a prescription for the drug.  *See id*. at 1229.

26             Here, the State's briefing argues the Act primarily regulates professional conduct,

27     where the State's power is at its greatest.  Alternatively, in a position embraced at hearing, the

28     State argues the speech regulated by the Act belongs at the midpoint of the continuum as speech

37

1   within the confines of a professional relationship.  The court concludes the Act lands at the

2   midpoint of the continuum.

3          The Act does not primarily regulate professional conduct.  In contrast to the law at

4   issue in *Pickup*, the Act is not directed at regulating specific treatment or services performed by

5   health providers; its primary purpose is to communicate information to patients about

6   reproductive medical services.  *See, e.g*., *Assembly Committee on Health Hearing*, Def.'s Ex. A,

7   at 3 (stating purpose of bill is to inform California women about their reproductive rights and

8   available health services).  In interpreting previous Ninth Circuit opinions, the *Pickup* court

9   clarified that "doctor-patient communications *about* medical treatment receive substantial First

10  Amendment protection, but the government has more leeway to regulate the conduct necessary to

11  administering treatment itself."  740 F.3d at 1227 (emphasis in original) (citing *Nat'l Ass'n for

12  Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043 (9th Cir. 2000), and

13  *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002)); *see also id.* at 1231 ("Certainly, under *Conant*,

14  content- or viewpoint-based regulation of communication about treatment must be closely

15  scrutinized.  But a regulation of only *treatment itself*—whether physical medicine or mental

16  health treatment—implicates free speech interests only incidentally, if at all." (emphasis in

17  original)).  Because the Act requires providers to communicate prescribed speech about available

18  reproductive medical services, the court finds it does not primarily regulate conduct.

19         Neither does the Act restrict a professional's ability to engage in public dialogue at

20  the other end of the spectrum.  The only speech the Act compels is the dissemination of a notice

21  that provides truthful, nonmisleading information to the clinics' clients during their appointments

22  at the clinic site.  The Act does not otherwise restrict speech.  The clinics and their staff remain

23  free to publicly advocate on public matters and even to criticize the Act during appointments with

24  their clients.  This narrow scope suggests the Act's purpose is to regulate speech within the

25  professional relationship, rather than to suppress a disfavored message within the public debate or

26  advance a favored viewpoint.

27

28

1           Because the Act regulates speech within the confines of a professional

2   relationship, the speech at issue here falls at the midpoint of the *Pickup* continuum.  The court

3   next considers what level of scrutiny the court should apply to the Act.

4                c)       <u>Level of Scrutiny</u>

5           In *Pickup v. Brown*, the Ninth Circuit described speech at the midpoint of the

6   continuum as receiving "somewhat diminished" First Amendment protection, but the court did

7   not specify the appropriate level of scrutiny accorded speech within the confines of a professional

8   relationship.  *See* 740 F.3d at 1228.  The court therefore turns to persuasive out-of-circuit

9   authority for guidance in determining the appropriate level of scrutiny.

10          In the context of abortion-related disclosures, circuit courts are split as to whether

11   the Supreme Court's decision in *Casey* announced a less demanding "reasonableness" test, or

12   whether some formulation of an intermediate level of scrutiny should apply.  In *Casey*, the

13   plurality upheld under the First Amendment a regulation requiring a doctor to disclose certain

14   information to a patient before performing an abortion to ensure she understands the full

15   consequences of her decision:

> 16   All that is left of petitioners' argument is an asserted First
> Amendment right of a physician not to provide information about
> 17   the risks of abortion, and childbirth, in a manner mandated by the
> State.  To be sure, the physician's First Amendment rights not to
> 18   speak are implicated, *see Wooley v. Maynard*, 430 U.S. 705(1977),
> but only as part of the practice of medicine, subject to reasonable
> 19   licensing and regulation by the State, *cf. Whalen v. Roe*, 429 U.S.
> 589, 603 (1977).   We see no constitutional infirmity in the
> 20   requirement that the physician provide the information mandated by
> the State here.
>
> 21

22   505 U.S. at 884.   The Fifth and Eighth Circuits have read *Casey* to mean that the state does not

23   violate the First Amendment when it enacts reasonable regulations requiring a physician to

24   provide truthful, non-misleading information relevant to a patient's decision regarding an

25   abortion.  *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 575–77 (5th

26   Cir. 2012) (describing *Casey's* response to the First Amendment claim as "clearly not a strict

27   scrutiny analysis," and "if anything, the antithesis of strict scrutiny"); *Rounds II*, 686 F.3d at 893

28   (quoting *Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 734

1 (8th Cir. 2008) (en banc) ("*Rounds I*")).  Drawing on *Casey* and *Gonzales v. Carhart*, 550 U.S.

2 124 (2007), the Fifth and Eighth Circuits reasoned that such regulations are justified because the

3 state has a significant role in regulating the medical profession, and the state has a legitimate

4 interest in respecting the life within a woman.  *See* 667 F.3d at 575–76; *Rounds I*, 530 F.3d at

5 734–35.

6 In contrast, the Fourth Circuit in *Stuart* concluded the "single paragraph" in *Casey*

7 responding to the First Amendment challenge did not intend to announce a guiding standard of

8 scrutiny superseding traditional First Amendment considerations in the context of abortion-

9 related disclosures.  *Stuart*, 774 F.3d at 248–49; *cf. Wollschlaeger*, 2015 WL 8639875, at *21

10 (noting the "brief treatment" of the First Amendment issue in *Casey* did not provide much insight

11 into how to analyze regulations of professional speech or why the statute at issue survived

12 scrutiny under the First Amendment).  Instead, the court in *Stuart* adopted the intermediate

13 standard of scrutiny applied in the commercial speech context, because it is "consistent with

14 Supreme Court precedent and appropriately recognizes the intersection . . . of regulation of

15 speech and regulation of the medical profession in the context of an abortion procedure."  774

16 F.3d at 248–49.  The court ultimately concluded that the statute at issue, which required doctors

17 to perform an ultrasound, display the sonogram, and describe the fetus to women seeking

18 abortions, did not withstand intermediate scrutiny, because it was not narrowly drawn to achieve

19 the government's interest in protecting fetal life.  *Id.* at 250, 255.

20 In *Wollschlaeger*, the Eleventh Circuit considered the appropriate level of scrutiny

21 to apply to a statute restricting physicians' ability to inquire about their patients' firearm

22 ownership.  2015 WL 8639875.  The court ultimately did not conclusively determine what level

23 of scrutiny should apply, finding the statute at issue survived even strict scrutiny; it did however

24 provide a helpful discussion of the professional speech framework.  *See id.* at *19–24.  The court

25 suggested in dicta that an intermediate level of scrutiny likely applied to the statute at issue,

26 because the restriction implicated both the state's interest in regulating the practice of the

27 professions to protect the public, and the state's interest in regulating relationships of a fiduciary

28 character to prevent undue advantage.  *See id.* at *22–24.  However, the court noted that a broad

1   reading of the Supreme Court's recent decision in *Reed v. Town of Gilbert, Ariz.*, 576 U.S. ___,

2   135 S. Ct. 2218 (2015), may suggest that all content-based regulations, including commercial and

3   professional speech, are now subject to strict scrutiny. *Id.* at *24.

4           In consideration of all that is before it, the court finds the Act is subject to no

5   greater than intermediate scrutiny.  Intermediate scrutiny properly accounts for the intersection of

6   compelled speech and the government's regulatory interests in the context of the facts of this

7   case.  As in *Wollschlaeger* and the cases involving abortion-related disclosures, the speech here

8   implicates the State's interests both in regulating the medical profession and in regulating

9   fiduciary relationships, which supports the application of a level of scrutiny lower than strict

10  scrutiny.  Again, the speech is made within the confines of the patient-provider relationship in the

11  course of a client's visit to the clinic site, and the speech provides information relevant to the

12  client's medical decisions.  In addition, intermediate scrutiny is consistent with the Ninth

13  Circuit's conclusion in *Pickup* that speech at the midpoint of the continuum is accorded

14  "somewhat diminished" protection under the First Amendment.  *See* 740 F.3d at 1228.  At this

15  point, the court need not determine whether the Act is subject to the specific holding of *Casey* or

16  whether *Casey* announces a less demanding "reasonableness" test in the context of abortion-

17  related disclosures, because the court ultimately holds the Act survives even intermediate

18  scrutiny.

19          Although the court concludes the Act is subject to a lesser level of scrutiny for

20  professional speech, the court finds plaintiffs have raised "serious questions" regarding the

21  applicable level of scrutiny, specifically whether strict scrutiny should apply, for purposes of the

22  Ninth Circuit's "serious questions" approach to preliminary injunctions.  As discussed above, the

23  Supreme Court has not directly addressed the applicable level of scrutiny for professional speech,

24  and a broad reading of the Supreme Court's recent decision in *Reed* may lead reasonable jurists to

25  conclude that all content-based regulations are now subject to strict scrutiny.  In addition, one

26  could make the case that certain factual differences between this action and the relevant precedent

27  support the application of strict scrutiny here.  For example, the required notice is not necessarily

28  disseminated by a doctor in the examining room, and plaintiffs' medical speech may be more

1    intertwined with their religious and political speech than the medical speech in the cases

2    discussed.  In light of this legal landscape, the court analyzes the Act under both intermediate and

3    strict scrutiny to evaluate plaintiffs' likelihood of success on the merits.

4                            3.       Application of Scrutiny

5                                 a)       Intermediate Scrutiny

6                    To survive intermediate scrutiny, the Act must "directly advance[] a substantial

7    governmental interest" and be "drawn to achieve that interest."  *Sorrell v. IMS Health Inc*., 131 S.

8    Ct. 2653 at 2667-68 (2011).  "There must be a fit between the Legislature's ends and the means

9    chosen to accomplish those ends."  *Id*. at 2668 (citation and quotation marks omitted).  This

10   formulation seeks to ensure "not only that the State's interests are proportional to the resulting

11   burdens placed on speech but also that the law does not seek to suppress a disfavored message."

12   *Id*.  At this stage, the court finds the Act survives intermediate scrutiny.

13                                (1)       Governmental Interest

14                   Here, the stated purpose of the Act is to ensure that California residents know their

15   rights and the health care resources available to them when they make their personal reproductive

16   health care decisions.  *See* AB 775 §§ 1, 2.  The State has a strong interest in ensuring that

17   pregnant women are fully advised of the range of health care options available to them in

18   California at the time they are making their reproductive decisions.  *See Madsen v. Women's*

19   *Health Ctr., Inc.,* 512 U.S. 753, 767 (1994) ("[T]he State has a strong interest in protecting a

20   woman's freedom to seek lawful medical or counseling services in connection with her

21   pregnancy.''); *Am. Life League, Inc. v. Reno*, 47 F.3d 642, 656 (4th Cir. 1995) (noting, in Free

22   Exercise Clause challenge, that government has compelling interest in "promoting unobstructed

23   access to reproductive health facilities").  The State also has a compelling interest in regulating

24   the practice of the professions, regulating fiduciary relationships, and promoting the public health

25   more broadly.  *See, e.g., Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975) ("States have a

26   compelling interest in the practice of professions within their boundaries, and . . . as part of their

27   power to protect the public health, safety, and other valid interests they have broad power to

28   establish standards for licensing practitioners and regulating the practice of professions.");

1    *Watson v. Maryland*, 218 U.S. 173, 176 (1910); *Aid for Women v. Foulston*, 441 F.3d 1101,

2    1119–20 (10th Cir. 2006); *cf. Varandani v. Bowen*, 824 F.2d 307, 311 (4th Cir. 1987) (observing,

3    in Due Process context, that government has "compelling interest in assuring safe health care for

4    the public").

5               As noted above, according to AB 775's author, the federal ACA has made millions

6    of Californians, 53 percent of them women, newly eligible for Medi-Cal.  Assembly Committee

7    on Health, Def.'s Ex. A, at 3; *see also* AB 775 § 1.  More than 700,000 California women become

8    pregnant every year, approximately half of them unintentionally.  AB 775 § 1.  Although 64.3

9    percent of unplanned births in California in 2010 were publicly funded, the Legislature found that

10   thousands of women remain unaware of the public programs available to them.  *Id.*  Plaintiffs do

11   not challenge these findings.  The court finds the statute advances substantial governmental

12   interests.

13                              (2)    Whether the Act is Properly Drawn to Achieve the
                                       Governmental Interest

14               The court finds the Act directly advances the State's interest in informing women

15   of the availability of publicly funded health resources and the manner in which the woman can

16   access those resources.  *See* AB 775 § 1.  In addition, the court finds the Act is narrowly drawn to

17   achieve that interest and does not overly burden speech.  The required notice provides no more

18   compelled speech than is necessary to convey the desired factual information.  The notice

19   provides the information in neutral language and does not incorporate ideological commentary or

20   convey an opinion.  Although it includes the word "abortion," the word appears in the context of

21   a list describing the full spectrum of reproductive health care services available in California.

22   The notice includes the phone number of the local county social services office, which provides

23   women with a direct and efficient manner in which to access the listed resources.  As noted

24   above, the Act does not otherwise restrict plaintiffs' speech.  Plaintiffs remain free to advocate

25   their viewpoint, or even to communicate disagreement with the Act or required notice.  The Act

26   does not seek to suppress a disfavored message.  *See Sorrell*, 131 S. Ct. at 2668.

27               Although plaintiffs argue the Act is overly burdensome because it would be the

28   first message clients receive when they walk through the clinics' doors, posting the notice

1    "conspicuously" in the waiting area is just one of the three options allowed under the Act.  Under

2    the second option, the Act does not specify when the clinic must distribute the printed notice to its

3    clients, saying only that it must be distributed to all of its clients in the specified typeface and

4    size.  Moreover, the notice may be combined with other mandated disclosures.  Cal. Health &

5    Safety Code § 123472(3).  The court finds the Act is narrowly drawn to achieve its interest while

6    providing plaintiffs with manageable options, and that the means chosen accomplish the State's

7    ends.  *See id.* at 2667–68.

8                                b)        Strict Scrutiny

9                Alternatively, if the court applies strict scrutiny, the Act "must be narrowly

10   tailored to promote a compelling Government interest," and must use the least restrictive means

11   to achieve its ends.  *Playboy Entm't*, 529 U.S. at 813.  However, the government is only required

12   to choose an alternative means when it would be "at least as effective in achieving the legitimate

13   purpose that the statute was enacted to serve," *Reno*, 521 U.S. at 874.

14               Whether the Act would also survive strict scrutiny is a closer question, but the

15   court finds the Act would likely survive even this highest level of scrutiny.  The interests

16   advanced by the Act are likely compelling governmental interests, and the Act is narrowly

17   tailored to promote those interests.  The required notice affects speech no more than is necessary

18   to convey the desired factual information.  In addition, the less restrictive alternative means

19   proposed by plaintiffs would likely not be as effective in achieving the statute's purpose.

20   Plaintiffs first suggest the State could use selective funding to give clinics incentives to make the

21   notice, but it is not clear the State would be able to disseminate the information as widely through

22   selective funding.  For example, plaintiffs do not receive governmental funding and their position

23   suggests government funding would not be an effective method of persuading them to

24   disseminate the notice.  Plaintiffs next argue the State could disseminate the information itself.

25   However, this argument ignores the Legislature's finding that "the most effective way to ensure

26   women quickly obtain the information and services they need to make and implement timely

27   reproductive decisions is to require licensed health care facilities . . . to advise each patient at the

28   time of her visit of the various publicly funded family planning and pregnancy-related resources

1    available in California, and the manner in which to directly and efficiently access those

2    resources."  AB 775 § 1.  Although the State could increase its efforts to promote public

3    awareness through its own ad campaign, the court at this stage finds that plaintiffs have not

4    refuted the Legislative determination that requiring dissemination of the notice at the time of a

5    clinic visit is more likely to reach the intended recipients at the time they are making their time-

6    sensitive reproductive decisions.

7                                    c)      *Evergreen*

8            The Second Circuit's decision in *Evergreen* does not change the court's

9    conclusions above.  In *Evergreen*, the Second Circuit considered an ordinance requiring

10   pregnancy services centers, New York's equivalent to CPCs, to make the following three

11   disclosures: (1) whether or not they have a licensed medical provider on staff (the "Status

12   Disclosure"); (2) "that the New York City Department of Health and Mental Hygiene encourages

13   women who are or who may be pregnant to consult with a licensed provider" (the "Government

14   Message"); and (3) whether or not they "provide or provide referrals for abortion," "emergency

15   contraception," or "prenatal care" (the "Services Disclosure").  *See* 740 F.3d at 238.  The

16   ordinance required the CPCs to provide the disclosures at their entrances and waiting rooms, on

17   advertisements, and during telephone conversations.  *Id*.  The legislative history of the ordinance

18   suggested its purpose was to prevent deceptive advertising and misleading practices by CPCs in

19   order to ensure women have prompt access to the type of care they seek.  *See id.* at 239–41.  For

20   example, testimony had been offered that certain CPCs intentionally selected locations in

21   proximity to a Planned Parenthood facility and used misleading tactics to prevent women from

22   entering the Planned Parenthood facility.  *See id.* at 239.

23           The Second Circuit in *Evergreen* concluded the Status Disclosure regarding

24   licensure status would survive even strict scrutiny, but that the Government Message and Services

25   Disclosures would not withstand even intermediate scrutiny.  *See id.* at 237–38, 246–51.  The

26   court found the Status Disclosure advanced compelling state interests in public health and

27   combating consumer deception.  *Id*. at 246–49.  The court found it was narrowly tailored and the

28   least restrictive means of achieving its purpose, because city-sponsored advertisements could not

1   alert consumers whether a particular pregnancy center had a licensed medical provider at the time

2   they interacted with the center.  *Id*. at 247.

3           In contrast, the court found the Government Message and Services Disclosures

4   would not survive even intermediate scrutiny, because the Status Disclosure alone may be

5   sufficient to achieve the ordinance's purpose, and the Government Message and Services

6   Disclosures overly burdened speech.  *Id*. at 249–51.  Specifically, the court found the

7   Government Message would not withstand scrutiny because it required pregnancy centers to

8   "affirmatively espouse the government's position on a contested public issue," though inclusion

9   of the word "encourages" and because the government could communicate the message itself

10  through an advertising campaign.  *Id*. at 250.  The court concluded the Services Disclosure would

11  not withstand scrutiny because it mandated discussion related to controversial political topics at

12  the beginning of the centers' contact with potential clients.  *Id*. at 249.

13          Here, the State compares the Act's notice requirement to the Status Disclosure,

14  while plaintiffs argue the notice is more similar to the Government Message or Services

15  Disclosure.  The court finds the Act's notice is distinguishable from all three disclosures in

16  *Evergreen*, because the Act seeks to advance different governmental interests.  Although the

17  legislative history of the Act suggests part of the Legislature's motivation was to combat

18  deceptive practices by some CPCs, the legislative history also suggests a key purpose of the

19  challenged provision was to inform women of the free and low-cost publicly funded health

20  services available to them at the time they are making their time-sensitive reproductive decisions.

21  The Legislature was concerned with women who may not be aware that certain health options are

22  available to them, and wanted to ensure women in California are informed of the full range of

23  free and low-cost services available to them when they make their reproductive decisions.  In this

24  way, the Act more closely resembles informed consent cases than deceptive advertising cases.

25          The specific language of the required notice and the means of disseminating the

26  notice further distinguish the Act from the Government Message and Services Disclosure in

27  Evergreen.  Although the topic of abortion may trigger discussion of controversial political topics,

28  it presents factual information about abortion, as well as the other health services available, in

46

1   neutral language.  Unlike the Government Message in *Evergreen*, which stated the government

2   "encourages" women who may be pregnant to consult with a licensed provider, the required

3   notice here does not express a particular ideological position with respect to reproductive issues.

4   In addition, the statute at issue in *Evergreen* was much more burdensome on speech.  It required

5   the CPCs to provide the disclosures at their entrances and waiting rooms, on advertisements, and

6   during telephone conversations.  In concluding the Service Disclosure did not withstand scrutiny,

7   the Second Circuit found it significant that the statute required the CPCs to utter the required

8   speech at the very beginning of their contact with potential clients.  Here, in contrast, the Act only

9   requires that the notice be posted on the wall of the waiting room or disseminated to clients

10  through a printed or electronic notice.  Under the printed notice option, plaintiffs may wait and

11  distribute the printed notice to their clients later on in the appointment, instead of uttering the

12  speech at the beginning of their contact.  Although the court considers the analysis in *Evergreen*,

13  that analysis is based on different facts and it ultimately does not affect the court's conclusions in

14  this action.

15                     d)      Conclusion

16              For the foregoing reasons, the court at this stage finds the Act survives

17  intermediate scrutiny for professional speech made within a patient-provider relationship, and

18  would likely be upheld even if the court applied strict scrutiny.  Accordingly, plaintiffs have not

19  shown a likelihood of success on the merits of their free speech claim.

20              However, plaintiffs have raised "serious questions going to the merits" of their free

21  speech claim under the Ninth Circuit's approach to preliminary injunctions.  *See Cottrell*, 632

22  F.3d at 1135.  As discussed above, plaintiffs have raised "serious questions" whether strict

23  scrutiny applies to the Act.  In addition, they have raised "serious questions" whether the Act

24  would survive strict scrutiny—in particular, whether less restrictive means would be at least as

25  effective in achieving the Act's purpose.  But before turning to whether plaintiffs have also

26  shown "the balance of hardships tips sharply in [their] favor," the court considers their second

27  claim.

28

1       B.      Claim Two: Free Exercise of Religion

2              The court considers plaintiffs' likelihood of success on their Free Exercise claim.

3   As with the free speech claim above, the parties disagree about the appropriate level of scrutiny to

4   apply.  Plaintiffs contend the Act unconstitutionally interferes with their right to free exercise of

5   religion.  As a result, they argue the Act is subject to strict scrutiny.  The State argues the Act is a

6   neutral law of general applicability, and is subject to rational basis review.

7              As discussed below, the court finds in this report the Act is a neutral law of general

8   applicability, subject to rational basis review.  The court also concludes the Act would survive

9   rational basis review.  Accordingly, plaintiffs are not likely to succeed on the merits of this claim.

10             1.      Free Exercise Claim

11             The Free Exercise Clause of the First Amendment provides that "Congress shall

12  make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

13  U.S. Const., Amend. I.[13]  The right to exercise one's religion freely, however, "does not relieve

14  an individual of the obligation to comply with a valid and neutral law of general applicability on

15  the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or

16  proscribes)."  *Emp't Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 879 (1990).

17  Indeed, an individual's religious beliefs do not excuse him from compliance with an otherwise

18  valid law prohibiting conduct that the state is free to regulate.  *Smith*, 494 U.S. at 878–79 (1990).

19             A neutral law of general applicability need not be supported by a substantial or

20  compelling government interest, even when "the law has the incidental effect of burdening a

21  particular religious practice."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S.

22  520, 531 (1993).  Such a law need only survive rational basis review.  *Stormans, Inc. v. Wiesman*,

23  794 F.3d 1064, 1075–76 (9th Cir. 2015).  For laws that are not neutral and not generally

24  _____

25        [13]    Although *Smith* was superseded by the Religious Freedom Restoration Act of 1993
    (RFRA), the Supreme Court later held that RFRA applies only to the federal government and not
26  the states.  *See Holt v. Hobbs*, ___US___, 135 S. Ct. 853, 859–60; *City of Boerne v. Flores*, 521
    U.S. 507, 532–36 (1997).  This remains true today for all cases but those governed by the
27  Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA).  *See Holt*, 135 S. Ct. at
    859–60; *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076 n.4 (9th Cir. 2015).

28

1  applicable, strict scrutiny applies.  *Id*. at 1076.  The tests for "[n]eutrality and general applicability

2  are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has

3  not been satisfied."  *Stormans*, 794 F.3d at 1076 (quoting *Lukumi*, 508 U.S. at 531).

4  Nevertheless, the court must consider each criterion separately so as to evaluate the text of the

5  challenged law as well as the "effect . . . in its real operation."  *Id*.  Accordingly, the court

6  assesses below whether the Act is neutral and generally applicable.

7                  a)      <u>Neutrality</u>

8        "[I]f the object of a law is to infringe upon or restrict practices because of their

9  religious motivation, the law is not neutral . . . ."  *Id*.  A law must be both facially and

10  operationally neutral.  *Id*.

11        "A law lacks facial neutrality if it refers to a religious practice without a secular

12  meaning discernable from the language or context."  *Id*.  Here, because the Act makes no

13  reference to any religious practice, conduct, belief, or motivation, it is facially neutral.

14        The more challenging question is whether the Act is operationally neutral,

15  particularly at the preliminary injunction stage, where the law has not yet gone into effect.  But

16  pre-enforcement challenges are nonetheless susceptible to this test.  *See Stormans*, 794 F.3d at

17  1073 (discussing whether state rules not yet in effect were operationally neutral).

18        Two decisions provide guidance.  In *Lukumi*, practitioners of the Santeria religion,

19  which prescribes ritual animal sacrifice as a principal form of devotion, challenged city

20  ordinances restricting the slaughter of animals.  508 U.S. at 524–25.  One of the challenged

21  ordinances flatly prohibited the sacrifice of animals, but the definition of "sacrifice" excluded

22  "almost all killings of animals except for religious sacrifice" and provided an additional

23  exemption for kosher slaughter.  *Id*. at 535–36.  The net result of this definition, the Court ruled,

24  was that "few if any killings of animals are prohibited other than Santeria sacrifice."  *Id*. at 536.

25  Because of the way the ordinance operated in practice, it actually prohibited only Santeria

26  sacrifice.  *Id*.  In this way, the challenged ordinance accomplished a "religious gerrymander,"

27  impermissible attempt to target religious practices through careful legislative drafting.  *Id*.

28

1        In contrast, the appellate court in *Stormans* found the rules at issue to operate

2   neutrally.  794 F.3d 1078.  In *Stormans*, pharmacy owners and pharmacists with religious

3   objections to dispensing emergency contraceptives challenged state rules requiring a pharmacy to

4   deliver or dispense such drugs.  *Id*. at 1072.  For individual pharmacists, the rules contained an

5   exemption for those who had "religious, moral, philosophical, or personal objections to the

6   delivery" of contraceptives.  *Id*.  The rules did not contain a similar requirement for pharmacies.

7   *Id*.

8        The court nonetheless found the rules operationally neutral.  When looking at the

9   exemption as applied to individual pharmacists, the court noted the rule-makers' conscious

10  decision to avoid unduly burdening pharmacists who objected to dispensing a prescription

11  medication.  *See id*. at 1076 ("As an initial matter, we note that as they pertain to pharmacists, the

12  rules specifically protect religiously motivated conduct.")  (emphasis omitted).

13       Regarding the law's application to pharmacies, the court discussed three main

14  points.  First, it reviewed the public policy undergirding the state's decision not to carve out a

15  religious objections exemption.  Specifically, the court noted the state rules provided "practical

16  means to ensure the safe and timely delivery of all lawful and lawfully prescribed medications to

17  the patients who need them."  *Id*. at 1077.  This purpose would have been significantly

18  undermined if pharmacies refused to deliver needed prescriptions because of a religious

19  objection, especially in rural areas where pharmacies were sparse.  *See id.* at 1078 ("The time

20  taken to travel to another pharmacy . . . may reduce the efficacy of those drugs").  Second, the

21  court noted the rules' delivery requirement, as related to pharmacies, applied to all objections to

22  deliveries that did not fall into an exemption, regardless of the motivation behind those

23  objections.  *Id.*  Finally, the court noted the delivery requirement also applied to all prescription

24  products, not just contraceptives, making the requirement broadly applicable to a range of drugs,

25  including those not subject to religious objections.  *See id.*

26       Akin to the law in *Stormans*, the Act provides no exemption for religious

27  objections.  But this lack of an exemption does not render the Act unconstitutional, because such

28  exemptions are not constitutionally required.  *See Smith*, 494 U.S. at 890 (holding states may

1     make nondiscriminatory religious practice exemptions, but that such exemptions are not

2     constitutionally required).  Additionally, the notice provision to which plaintiffs object applies to

3     all licensed facilities with limited exceptions unrelated to religion, and regardless of the reason for

4     objections.  Finally, the notice provision applies to multiple forms of contraception and

5     reproductive care, not just abortion, requiring that clients be informed of their right of access to

6     "comprehensive family planning services," including "all forms of FDA-approved methods of

7     contraception" and prenatal care.  AB 775 § 1.  The Act is operationally neutral.

8            The court reaches this conclusion notwithstanding plaintiffs' argument that the

9     Legislature "zeroed in on 'crisis pregnancy clinics'" or CPCs by affiliating CPCs with "pro-life

10    (largely Christian belief-based) organizations."  Mem. P. & A. at 24.  Laws targeting religious

11    conduct for distinctive treatment are not shielded merely by facial neutrality.  *Id. (citing Lukumi*,

12    508 U.S. at 534).  And the record before the court shows it was the activities of CPCs, many of

13    them Christian-based, that largely motivated the Act's notice requirement.[14]  As noted by the

14    Act's authors, reports showed at least some CPCs were giving clients "inaccurate information

15    about reproductive health, including only information "regarding the risks of abortion, . . . that

16    many women commit suicide after having an abortion, and . . . abortions can cause breast

17    cancer."  Pls.' Ex. 3 at 5.

18            In a limited sense this case resembles *Lukumi*, where the Legislature considered

19    the activities inherent in the petitioner's Santeria religious practice when deciding whether to ban

20    these activities.  But in *Lukumi*, unlike in this case, the Legislature's target was not the activity of

21    animal killings or sacrifices, but the practice of Santeria itself.  Animal killings, to the extent they

22    were not associated with the practice of Santeria, were not prohibited.  *See Lukumi*, 508 U.S. at

23

------

24            [14]  The court recognizes the other motivation behind this act, namely "to ensure that
       California residents make their personal reproductive health care decisions knowing their rights
25     and the health care services available to them."  AB 775 § 2.  But a law that aims to regulate
       religious conduct for distinctive treatment is not rendered constitutional simply because its stated
26     purpose is benign or neutral.  *See Lukumi*, 508 U.S. at 534 (holding laws that target religious
       conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of
27     facial neutrality).

28

1   543 ("Despite the city's proffered interest in preventing cruelty to animals, the ordinances are

2   drafted with care to forbid few killings but those occasioned by religious sacrifice.  Many types of

3   animal deaths or kills for nonreligious reasons are either not prohibited or approved by express

4   provision.").  Here, in contrast, the Legislature's target in part, dishonest tactics meant to

5   discourage abortions, is burdened by the notice requirement regardless of any religious

6   motivation, if burdened at all.[15]  The authors' suggestion is correct:  the Act "regulate[s] all

7   pregnancy centers, not just CPCs, in a uniform manner."  Pls.' Ex. 5 at 3.

8                          b)        General Applicability

9              The court next considers whether the Act is generally applicable.  *Lukumi*, 508

10  U.S. at 542.  If a law promotes the government's interest "only against conduct motivated by

11  religious belief" but fails to include in its prohibitions substantial, comparable secular conduct

12  that would similarly threaten the government's interest, then the law is not generally applicable.

13  *Id*. at 543, 545.  A law is generally applicable despite exemptions if it does not "afford unfettered

14  discretion [to its enforcers] that could lead to religious discrimination," because the exemptions

15  are "tied to particularized objective criteria."  *Stormans*, 794 F.3d at 1081–82.

16             Here, the Act requires licensed pregnancy centers to post notices informing

17  women of a range of reproductive options available to them.  The Act carves out two exemptions:

18  (1) those clinics "directly conducted, maintained, or operated by the United States or any of its

19  departments, officers, or agencies"; and (2) those licensed primary care clinics enrolled as a

20  Medi-Cal provider and provider in the Family Planning, Access, Care, and Treatment (PACT)

21  Program.  Cal. Health & Safety Code § 123471(c).

22             The legislative history provides insights into why these exemptions were made.

23  According to the Assembly Judiciary Committee report, the first exemption was provided to

24  clinics operated by the federal government in order to avoid preemption concerns.  Pls.' Ex. 3 at

25  12.  As to the second exemption, the Committee report explained a licensed primary care clinic

26  _____

27       [15]   Although the legislature discussed CPC tactics used to discourage abortions, AB 775
     does not inhibit the use of such tactics.  Notwithstanding AB 775, CPCs can continue to engage
     in practices designed to discourage women from obtaining abortions.

28

1    that is both a Medi-Cal provider and a Family PACT provider already offers the full continuum of

2    health care services as described in the notice to be disseminated under the statute, that is,

3    comprehensive family planning services, contraception, prenatal care, and abortion.  *Id.*

4    Accordingly, there was no need to subject such facilities to the notice provisions.  *Id.*

5           These justifications are "tied to particularized, objective criteria," such that the

6    exemptions do not allow for "unfettered discretion that could lead to religious discrimination."

7    *Stormans*, 794 F.3d at 1082.  They are a far cry from those in *Lukumi*, where the exemptions were

8    allowed for killing animals if seen as "important," "self-evident," and "obviously justified," broad

9    terms susceptible to wide-ranging discretion in enforcement.  508 U.S. at 544.  The Act here is

10   generally applicable.

11                  2.     Application of Rational Basis Review

12          Because the Act is neutral and generally applicable, the court applies rational basis

13   review, which requires a rational relation to a legitimate governmental purpose.  *Stormans*, 794

14   F.3d at 1084.  Plaintiffs have the burden to negate every conceivable basis that might support the

15   law at issue.  *Id.*

16          The stated purpose of the notice provision is to ensure that women "quickly obtain

17   the information and services they need to make and implement timely reproductive decisions."

18   AB 775 § 1.  The law's sponsors identified a need to supplement the State's existing efforts in

19   advising women of its reproductive health programs, because pregnancy decisions are time-

20   sensitive and competent care early in pregnancy is important.  *Id.*  As mentioned above, the State

21   has a legitimate interest in ensuring women make an informed decision regarding an abortion.

22   *See Casey*, 505 U.S. at 881–83.  The Act's purpose is legitimate.

23          The means used to effectuate this purpose, mandating a notice informing visitors

24   to licensed facilities of the range of reproductive care resources available, is rationally tailored to

25   the purpose of helping women quickly obtain information necessary to making "personal

26   reproductive health care decisions."  AB 775 § 1.  Requiring dissemination of the notice at the

27   time of a clinic visit is more likely to reach the intended recipients at the time they are making

28

1  their time-sensitive reproductive decisions.  The law is rational and survives the level of

2  constitutional scrutiny due on this claim.

3           Accordingly, plaintiffs have not shown a likelihood of success on their Free

4  Exercise claim, and have not raised serious questions going to the merits of this claim.

5  VII.    IRREPARABLE HARM, BALANCE OF HARDSHIPS AND PUBLIC INTEREST

6           A preliminary injunction may issue when the moving party raises serious questions

7  going to the merits and demonstrates the balance of hardships tips sharply in its favor, so long as

8  the court also considers the other two prongs of the *Winter* test, the  likelihood of irreparable

9  injury and the public interest.  *Cottrell*, 632 F.3d at 1134–35.  Having found plaintiffs have raised

10  serious questions going to the merits of their free speech claim, the court considers whether

11  plaintiffs have shown there is a likelihood of irreparable injury, whether the balance of hardships

12  tips sharply in plaintiffs' favor, and whether an injunction is in the public interest.

13       A.    Irreparable Injury

14           Plaintiffs allege injury in the form of interference with their constitutional right to

15  free speech and monetary injuries from the civil penalties of the Act imposes.  Plaintiffs argue

16  they will suffer irreparable harm if the Act is not enjoined, because it raises serious First

17  Amendment questions, and the failure to provide notice as required under the Act will result in a

18  civil penalty of $500 for the first violation and an additional $1,000 for every subsequent

19  violation.  Mem. P. & A. at 21; *see* Cal. Health & Safety Code § 123472(a) (notice requirement);

20  *id.* § 123473(a) (civil penalty provisions).  The State argues plaintiffs have submitted no evidence

21  to support an alleged injury.  Opp'n at 19.

22           While the Supreme Court has held "[the loss of First Amendment freedoms, for

23  even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427

24  U.S. 347, 373 (1976); *see also Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir.

25  2009), a mere "assertion of First Amendment rights does not automatically require a finding of

26  irreparable injury,. . . entitling a plaintiff to a preliminary injunction if he shows a likelihood of

27  success on the merits," *Hohe v. Casey*, 868 F.2d 69, 72-73 (3d Cir. 1989).  Rather, it is

28  "purposeful unconstitutional suppression of speech [that] constitutes irreparable harm for

preliminary injunction purposes." *Goldie's Bookstore Inc. v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir. 1984); *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983) ("[D]irect penalization, as opposed to incidental inhibition, of First Amendment rights constitutes irreparable injury."). Here, the court has found the Act regulates speech within the confines of a professional relationship, and plaintiffs have raised serious questions that this compelled speech violates their freedom of speech.  This is sufficient to constitute irreparable injury.

Regarding the civil penalties, monetary injury generally does not constitute irreparable injury.  *LA Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980).  However, financial losses that would be unrecoverable due to California's Eleventh Amendment sovereign immunity do constitute irreparable injury.  *Cal. Hos. Ass'n v. Maxwell-Jolly*, 776 F. Supp. 2d 1129, 1157 (E.D. Cal. 2011); s*ee also Kansas Health Care Ass'n v. Kansas Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994) (Eleventh Amendment bars retrospective monetary relief against a state thus making a monetary injury irreparable).  Plaintiffs' inability to recover from the State alone is sufficient to constitute possible irreparable injury.

Plaintiffs must establish the irreparable harm is likely, not just possible *Alliance for the Wild Rockies*, 632 F.3d at 1131 (citing *Winter*, 555 U.S. at 22).  The harm must not be speculative, but imminent.  *Caribbean Marine Services Co., Inc. v. Baldridge*, 844 F.2d 668, 675 (9th Cir. 1988).  Given that plaintiffs have raised serious questions on the merits of their free speech claim, plaintiffs have shown a likelihood of irreparable injury to their First Amendment rights.  *See Tracy Rifle and Pistol LLC v. Harris*, ___ F. Supp. 3d ___, 2015 WL 4395025, at *9 (E.D. Cal. July 16, 2015).  In addition, as the Act is scheduled to take effect January 1, 2016, there is an impending threat of civil penalties being imposed if plaintiffs do not comply with the notice requirement.  There are no contingencies that need occur before the alleged injuries are experienced, nor are the alleged injuries merely speculative.  *Compare City of South Lake Tahoe v. California Tahoe Regional Planning Agency*, 625 F.2d 231, 233 (9th Cir. 1980) (finding the future injury was not sufficiently real and imminent, where city councilmembers alleged they

1   would be exposed to civil liability by enforcing an ordinance if the constitutionality of the

2   ordinance were challenged in the future).

3           Plaintiffs have shown they are likely to suffer irreparable injury.

4       B.    <u>Balance of Hardships</u>

5           The court next examines whether plaintiffs have established that the balance of

6   hardships tips sharply in their favor. *Winter*, 555 U.S. at 20. To assess this prong, the court

7   "balance[s] the interests of all parties and weigh[s] the damage to each." *Stormans, Inc. v.*

8   *Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (citing *L.A. Mem'l Coliseum Comm'n* , 634 F.2d at

9   1203). Here, it is not enough for there to be serious questions as to the merits of a First

10   Amendment claim. *See Paramount Land Co. LP v. Cal. Pistachio Comm'n*, 491 F.3d 1003, 1012

11   (9th Cir. 2007). Rather, the court "must balance the competing claims of injury and must

12   consider the effect on each party of the granting or withholding of the requested relief." *Amoco*

13   *Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987).

14           Here, the State argues if the Act is enjoined, the injunction will harm women in

15   California who are in need of "publicly funded family planning services, contraception services

16   and education, abortion services, and prenatal care and delivery," but unaware of the free public

17   programs available providing these services. Opp'n at 19. The State points to the legislative

18   history, which reported that "[i]n 2012, more than 2.6 million California women were in need of

19   publicly funded family planning services. More than 700,000 California women become

20   pregnant every year and one-half of these pregnancies are unintended." AB 775 § 1. Although

21   64.3 percent of unplanned births in California in 2010 were publicly funded, the Legislature

22   found that thousands of women remain unaware of the public programs available to them. *Id.* If

23   the statute is enjoined, during the injunction, the women eligible for the free or low-cost

24   comprehensive publicly funded family planning services and pregnancy-related care will have

25   reduced access to all of the information they need to make a fully informed decision about their

26   pregnancy. *See id*. Though the preliminary injunction plaintiffs seek would only enjoin

27   enforcement of the Act as to the three plaintiffs, Reply at 11, their clients are California residents.

28   At hearing, counsel was unable to identify the number of women plaintiffs serve. And, the state

1  argues, "[a]ll California women, regardless of income, should have access to reproductive health

2  services." *Id.*

3       Hence, on the one hand, if the court denies the injunctive relief, plaintiffs are likely

4  to suffer irreparable injuries with respect to their constitutional rights and incur civil penalties,

5  neither of which can be adequately remedied through damages. *See Selecky*, 586 F.3d at 1138.

6  On the other hand, granting an injunction would interfere with the Legislature's intention to

7  provide accurate information to all women seeking family planning or pregnancy-related services

8  from plaintiffs. *See* AB 775 § 1.  As discussed above, California has a special interest in

9  protecting and regulating trades that closely concern public health. *See Nat'l Ass'n for*

10  *Advancement of Psychoanalysis*, 228 F.3d at 1054–55; *see also Am. Acad. of Pain Mgmt.*, 353

11  F.3d at 1109 ("States have a compelling interest in the practice of professions within their

12  boundaries, and . . . as part of their power to protect the public health, safety, and other valid

13  interests they have broad power to establish standards for licensing practitioners and regulating

14  the practice of professions." (citation omitted)).

15       Secondly, when a party seeks injunctive relief against a state government,

16  concerns of comity and federalism are raised. *See Clark v. Coye*, 60 F.3d 600, 603–04 (9th Cir.

17  1995).  And "any time a state is enjoined by a court from effectuating statutes enacted by

18  representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. of*

19  *Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers).

20       Plaintiffs argue they will suffer irreparable injury if the injunction is not granted;

21  the court agrees.  However, the State has also shown a strong interest in providing public health—

22  the health of the California women who seek services from plaintiffs.  And plaintiffs have

23  provided no evidence to challenge the State's findings.  Thus, in weighing the injuries both

24  parties are likely to suffer, the court finds plaintiffs have not established the balance of hardships

25  tips sharply in their favor.

26       C.    Public Interest

27       Even if plaintiffs established the balance of hardships tips sharply in their favor,

28  plaintiffs also bear the burden of showing the injunction is in the public interest. *Winter*, 555 U.S.

at 20.  While the court's analysis of the balance of hardship is narrowed to the parties affected, the court can consider the hardships to all individuals covered by the Act, not limited to the parties, in assessing the public interest.  *Golden Gate Rest. Ass'n v. City & County of S.F.*, 512 F.3d 1112, 1126 (9th Cir. 2008).  Though "[p]ublic interest favors the exercise of First Amendment rights," *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014), "where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may [then] in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312–13 (1982).  In considering whether the public interest is impaired, the court weighs only the public interest in light of the likely consequences of the injunction and need not reach possibilities that are highly speculative.  *See Golden Gate Rest. Ass'n*, 512 F.3d at 1126.

Plaintiffs argue there is a "significant interest in upholding First Amendment principles."  Mem. P&A at 22 (quoting *Sammartano v. First Judicial Dist. Court,* 303 F.3d 959, 974 (9th Cir. 2002), *abrogated on other grounds by Winter*, 555 U.S. 7).  Plaintiffs further contend when constitutional grounds are threatened, and where the State has shown no "urgency for the particular enactment" posing the threat, it is in the public interest to make sure the Act is constitutional before effectuating it.  Mem. P&A at 22.

Here, if the injunction is granted, it will limit the ability of a subset of women who are or may be pregnant from accessing the straightforward information in the required notice when they are making their time sensitive reproductive decisions.  And "[t]he general public has an interest in the health of state residents."  *Selecky*, 586 F.3d at 1139 (citing *Golden Gate Rest. Ass'n*, 512 F.3d at 1126 (quotation marks omitted)).  The Act is intended to provide notice of such healthcare services to women in California and there is a general public interest in ensuring the women of this state know they have access to publicly funded healthcare related to family planning, contraception, abortion, and prenatal care and delivery.  Enjoining the Act would interfere with the public interest regarding the health of state residents.

1    Accordingly, though the public interest favors upholding the First Amendment, the

2  public interest also favors ensuring California women are fully informed as to their reproductive

3  healthcare options.  The grant of an injunction would not only affect the parties here, but would

4  also have an effect on non-parties and the greater public.  *See Selecky*, 586 F.3d at 1139.

5  Weighing the two effects, the court finds plaintiffs have not carried their burden in showing the

6  injunction is in the public interest.

7  VIII.   <u>CONCLUSION</u>

8    For the foregoing reasons, plaintiffs' motion for a preliminary injunction enjoining

9  AB 775 from taking effect is DENIED.

10    IT IS SO ORDERED.

11  DATED:  December 18, 2015.

14  UNITED STATES DISTRICT JUDGE